[Cite as *State v. Powell*, 2014-Ohio-2048.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 99386**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## JONATHAN POWELL

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED IN PART, REVERSED IN PART,
AND REMANDED FOR RESENTENCING

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-12-560026

**BEFORE:** Stewart, J., Jones, P.J., and E.A. Gallagher, J.

**RELEASED AND JOURNALIZED:** May 15, 2014

**ATTORNEY FOR APPELLANT**

Joseph V. Pagano
P.O. Box 16869
Rocky River, OH    44116


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

BY:    Jesse W. Canonico
            Katherine Mullin
Assistant County Prosecutors
The Justice Center
1200 Ontario Street, 9th Floor
Cleveland, OH    44113

MELODY J. STEWART, J.:

{¶1} A jury found defendant-appellant Jonathan Powell guilty of shooting and killing two childhood friends: TreVaun Brown and Cedric Tate. There were no eyewitnesses to the shooting, and different guns were used to kill each victim. The state offered circumstantial evidence of murder by showing that Powell and his victims were alone at the time of the shootings, that Powell was known to carry the same kind of gun and ammunition used in one of the shootings, that Powell went into hiding after the murders, that Powell made incriminating statements to others shortly after the murders, and that jail authorities intercepted a letter Powell attempted to send to some of those present at the location of the shootings telling them to make no statements to the police and to avoid testifying in court. The jury found Powell guilty of two counts of aggravated murder (Tate), two counts of murder (Brown), and two counts of kidnapping (Tate and Brown). The jury specified that Powell used a firearm in the commission of the murder and kidnapping counts. The aggravated murder counts merged and the court sentenced Powell to life without the possibility of parole. The murder counts merged and the court sentenced Powell to 15 years to life. The court sentenced Powell to eight years on both kidnapping counts. The gun specifications for each murder and kidnapping count were merged, but ordered to be served consecutively and prior to the life sentence because the evidence showed that two guns were used.

{¶2} On appeal, Powell raises 11 assignments of error. A number of those arguments can be grouped into the following three categories: evidentiary, trial, and

sentencing. His evidentiary arguments are that the state failed to prove the essential elements of the charges beyond a reasonable doubt and that the jury's verdict was against the manifest weight of the evidence. The trial arguments complain of prosecutorial misconduct, ineffective assistance of counsel, erroneous admission of evidence, and faulty jury instructions. Powell's sentencing arguments are that the court erred by failing to merge certain counts for sentencing and that the length of his sentence constitutes cruel and unusual punishment, is contrary to law, and is an abuse of the court's discretion.

I

{¶3} We first address questions concerning the sufficiency and weight of the evidence. Powell argues that the state failed to prove that he acted with prior calculation and design for committing aggravated murder, that it failed to prove that he kidnapped the victims, and that it failed to prove the firearm specifications. Powell's arguments going to the weight of the evidence center on the credibility of the state's witnesses and the lack of physical evidence tying him to the murders.

A

{¶4} Powell argues that there was no evidence to show that he murdered the victims. No witnesses saw him with a gun on the night of the shootings, nor did police obtain any physical evidence to tie him to the shootings.

1

{¶5} We decide whether the evidence is sufficient to sustain a verdict by examining the evidence in the light most favorable to the prosecution and determining

whether any rational trier of fact could have found that the prosecution proved the essential elements of the crime beyond a reasonable doubt. *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 78, citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

2

{¶6} With the absence of eyewitnesses, the state premised its case against Powell on circumstantial evidence. "Circumstantial evidence is defined as '[t]estimony not based on actual personal knowledge or observation of the facts in controversy, but of other facts from which deductions are drawn, showing indirectly the facts sought to be proved.'" *State v. Nicely*, 39 Ohio St.3d 147, 150, 529 N.E.2d 1236 (1988), quoting *Black's Law Dictionary* 221 (5th Ed.1979). There is no difference, at least in terms of probative value, between circumstantial evidence and direct evidence. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph one of the syllabus.

{¶7} The evidence showed that the shootings occurred at a house where Powell's family formerly resided. Although his family moved from the house, the utilities were maintained and Powell continued to use the house as a place where his friends could drink and gamble. On the night of the shooting, Powell had a number of people over to the house. Some of them were in the basement shooting dice. Powell and Tate were upstairs and began wrestling. It was unclear why they began wrestling, but witnesses said that Powell had a smile on his face, so they assumed that Powell and Tate were wrestling for fun. Everyone then left the house and went to a bar. They returned to the

house a few hours later without incident. One witness saw Powell and Brown go into the basement. A while later, those present heard gunshots from the basement. Powell came up from the basement and was characterized as looking like "a demon." Powell said that Brown was in the basement "tripping, he shooting that gun" and commented on the fact that Tate brought Brown to the house. One of the people at the house went down to the basement and saw that Brown had been shot. He came back upstairs, told everyone that they had to leave, and asked Powell, "[w]hat the f*ck did you do?" Everyone started running for the front door, but Powell was seen putting his arm out to prevent Tate from leaving. Powell then slammed the door shut. He and Tate were the only two people left in the house. Seconds later, witnesses saw a flash of light coming from the window and heard shots fired.

{¶8} Tate and Brown were shot multiple times: Brown was shot five times in the head, trunk, and right lower extremity; Tate was shot five times in the trunk, right and left upper extremities, and left lower extremity. The two victims had been shot by different guns: Brown by a .38 caliber; Tate by a .45 caliber. Powell was known to carry a .45 caliber firearm and the type of bullet recovered from Tate's body matched boxed ammunition found in Powell's house.

3

{¶9} The state's case presents a textbook example of circumstantial evidence — for both shootings, the evidence showed that Powell and each of his victims were alone in a room together and that only Powell emerged while the other was shot and killed. From

this evidence, a reasonable trier of fact could deduce that only Powell could have been the killer.

{¶10} Powell argues that none of this evidence proves that he acted with prior calculation and design to commit aggravated murder as required by R.C. 2903.01(A) or that he acted purposely to commit murder as required by R.C. 2903.02(A).

{¶11} "Prior calculation and design" is not defined by the Revised Code, but the Ohio Supreme Court has considered the phrase to "indicate studied care in planning or analyzing the means of the crime as well as a scheme encompassing the death of the victim." *State v. Taylor*, 78 Ohio St.3d 15, 19, 676 N.E.2d 82 (1997). This requires "more than the few moments of deliberation permitted in common law interpretations of the former murder statute, and to require a scheme designed to implement the calculated decision to kill." *State v. Cotton*, 56 Ohio St.2d 8, 11, 381 N.E.2d 190 (1978).

{¶12} We have no difficulty finding that the state offered sufficient evidence to prove that Powell acted with prior calculation and design when murdering Tate. The evidence showed that Powell had moments earlier killed Brown and then blamed Tate for bringing Brown to the house. When those present in the house started to flee, Powell deliberately blocked Tate from leaving and moments later killed him. A rational trier of fact could find that at the point when Powell refused to let Tate leave, he had made the decision to kill Tate. This decision was more than just instantaneous and reflected a calculated thought process.

4

**{¶13}** We likewise find that the state offered sufficient evidence to show that Powell acted purposely in causing Brown's death. A person acts "purposely" when "it is his specific intention to cause a certain result." R.C. 2901.22(A). Brown was shot once in the temple, three times in the back, and once in the back of the leg. The number of gunshot wounds coupled with the location of those gunshot wounds, including the back, indicated that Powell acted with the intent to cause Brown's death. Powell offered no evidence that he acted in self-defense. A finding that Powell acted purposefully was the only rational conclusion from the evidence.

B

**{¶14}** The evidence showing that Powell shot both victims was itself sufficient to prove the firearm specifications. Those specifications, charged under R.C. 2941.141(A) and 2941.155(A), were that Powell had a firearm on his person or under his control during the commission of the murders. The victims were killed by firearms, so a finding that Powell shot the victims necessarily constitutes proof that he had a firearm on his person when he shot them.

C

**{¶15}** The jury found Powell guilty of two counts of kidnapping under R.C. 2905.01(A)(3), one count for each victim. That section defines kidnapping as purposely removing a person by force or restraining that person's liberty for the purpose of inflicting serious physical harm on the victim.

1

{¶16} The kidnapping count relating to Tate was proved by more than sufficient evidence. As all of the others were leaving the house in the wake of Brown's killing, Powell was seen putting his arm out to prevent Tate from leaving the house. That act alone constituted a restraint for purposes of the kidnapping statute. What is more, the restraint was for the purpose of inflicting serious physical harm on Tate, as evidenced by the gunshots fired just moments later.

2

{¶17} There was no evidence of kidnapping relating to Brown. The only testimony touching on this count was that of a witness who did not actually see Powell and Brown go into the basement — the witness said only that he saw them walking toward the basement steps and presumed that they were going to the basement. The witness described nothing unusual or coercive; in fact, he said that the mood in the house at the time had been one where people were laughing and joking.

{¶18} The state makes no argument that it proved the elements of kidnapping in connection with Brown, nor could the jury infer restraint on the facts we have recited. Viewing the facts most favorably to the state shows that Brown appeared to be under no restraint or compulsion as he headed toward the basement steps with Powell. The kidnapping conviction relating to Brown must be vacated.

D

{¶19} We next consider Powell's argument that the jury's verdict is against the manifest weight of the evidence. He argues that the state failed to prove any motive for

the murder; that many of the witnesses were biased and admitted to lying in their stories to the police; that there were inconsistencies in the testimony; and that there was a lack of forensic evidence to tie him to the murders.

{¶20} While it is true that the police were unable to establish any kind of motive for the shootings, Powell's motive was not an element of any of the charged offenses, so the state had no need to offer any motive. *State v. Lancaster*, 167 Ohio St. 391, 149 N.E.2d 157 (1958), paragraphs one and two of the syllabus. And while the state often offers proof of a defendant's motive to put his actions in context with the rest of the evidence, that kind of proof was unnecessary in this case. As we previously discussed, the state offered a classic case of circumstantial evidence for both murders — Powell and his victims were alone when the shootings occurred, no one else had access to the areas where Powell and his victims were at the time of the shootings, and only Powell exited from those areas alive. Powell's actions may appear senseless without the context that a motive provides, but that fact does not detract from the strength of the state's circumstantial case.

{¶21} Apart from the circumstantial evidence provided by witnesses at the house, Powell's actions after the shooting tended to show his guilt. He showed up at the home of his infant goddaughter at about 4 a.m., just a few hours after the shootings. The goddaughter's mother heard a knock at the door and thought it was her boyfriend, so she unlocked the door, went back to her bedroom, and closed the bedroom door. Powell let himself into the bedroom, woke his goddaughter who was sleeping in the same room with

her mother, and began playing with her. The child's mother found this conduct unusual, so she asked him what was wrong. Powell replied, "I f*cked up." When she asked him to be more specific, he simply ignored her and went on playing with the child. A short while later, the child's father appeared. The father had been present at Powell's house during the shootings, and expressed dismay at Powell's presence in the house. He told Powell to leave. Powell left the house a few minutes later.

{¶22} Powell went to the house of a female friend the day after the shooting. He spent the day there, and then had his aunt drive the friend to a motel. He met her at the motel and they stayed there for two days, not leaving the room. The female friend had heard about the shootings and asked Powell what happened, but he refused to comment.

{¶23} Perhaps most telling of Powell's post-shooting activities was his attempt to contact friends and family while being held in jail. Just two weeks after Powell's arrest, jail officials intercepted a letter addressed to "the Fam." A corrections sergeant in the sheriff's department testified that the word "Fam" was a "red flag" for gang-related activity. The letter was addressed to a residence on the same street where the murders occurred and bore a fictitious return address. Included in the letter was written: "My real info: Jonathan Powell, SO 0276144, Cleveland, Ohio, 44101." The letter was signed "Johnny AKA Johnny B." The letter "B" was a reference to Powell's nickname, "Bravo." Among other things, the letter stated to one individual that "they can't charge you with murder if it ain't no witnesses." The letter stated: "But for real, the statements that count is Cookville and his Fam. Dom no sh*t won't or Brian, so try to get in touch

with Cookville and let him know the real for me please." It also instructed the recipient of the letter to tell two persons who were present at the house during the shooting "just don't make no statements cuz they don't have to[.]" The letter asked the recipient to tell some of those present at the shooting "I'm sorry too." The letter instructed the recipient to "burn these letters ASAP." Two of Powell's friends testified that they recognized the handwriting in the letter as Powell's.

{¶24} Powell's post-shooting conduct manifested a consciousness of guilt. A jury could find that the testimony Powell stated just hours after the murders that he "f*cked up" and his attempts to have certain witnesses refuse to speak with the police was credible evidence that he committed the murders.

{¶25} Powell testified at trial to a version of events that lacked credibility. He did not claim self-defense, but rather that he was on the third floor of the house when he heard arguing on the first floor. He went downstairs and asked what was happening and then remarked that "they tripping." He went back upstairs and heard a single gunshot. He said he then heard a "boom, boom, boom, boom." He looked out the window but saw "nothing going on." He thought it was gunplay stating, "we hear gunshots all the time." When Powell went downstairs, he found no one in the front room of the house and saw that the front door was cracked. He went outside and entered the car of one of those present at the house.

{¶26} The jury could reasonably have rejected Powell's version of events. None of the witnesses who were present at the time of the shooting placed Powell on the third

floor of the house at the time of the shooting. In fact, they were consistent in saying that Powell went into the basement with Brown and emerged after shots had been fired. Powell's version of events also omitted any reference to the series of shots that killed Tate. The witnesses said that the second series of shots were fired just seconds after they left the house. Powell firmly testified that he did not hear a second set of gunshots, even though he claimed to have gone down to the first floor after the first series of shots only to find the house deserted. Again, his testimony conflicted with that of other witnesses.

{¶27} Powell argues that there was no forensic evidence to tie him to the murders and that there were inconsistencies in the testimony by the state's witnesses that rendered the jury's verdict suspect. The lack of any DNA evidence was unimportant in light of the eyewitness testimony that placed Powell alone with both victims shortly before they were shot. Powell maintains that these witnesses lacked credibility, noting that many of them admitted at trial that they lied to the police during the investigation; for example, denying that they were present in the house at the time of the shooting. It is true that some of the state's witnesses gave testimony that was at odds with their initial statements to the police. But the testimony was consistent with certain established facts. The bodies were found exactly where the testimony indicated they would be found: Brown in the basement; Tate near the front door. Powell's known possession of a .45 caliber pistol was consistent with the discovery of a box of ammunition of the same brand as the bullets recovered from Tate's body. Powell not only went into hiding after the shootings, he made certain statements that, when considered in the context of what transpired in the

house, were highly suggestive of culpability. What is more, Powell's post-shooting attempt to silence witnesses spoke volumes with regard to his guilt. The jury's verdict indicates that it accepted the version of events given by the state's witnesses and rejected Powell's version. We have no basis for disagreeing with that assessment of the evidence. *See State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus.

E

**{¶28}** Powell argues that the jury returned inconsistent verdicts by finding him guilty of aggravated murder in Count 4 of the indictment but finding him not guilty of murder, a lesser included offense, as charged in Count 5. He argues, without citation to authority, that this finding is an impossibility because one must necessarily be guilty of a lesser included offense if one is guilty of the greater offense. He maintains that this inconsistency proves that the jury's verdict was against the manifest weight of the evidence.

**{¶29}** A lesser included offense is an offense of a lesser or inferior degree which, as legally defined, must necessarily be committed when the charged offense, as legally defined, is committed. *State v. Kidder*, 32 Ohio St.3d 279, 513 N.E.2d 311 (1987). The crime of murder is a lesser included offense of aggravated murder. *State v. Reed*, 65 Ohio St.2d 117, 124, 418 N.E.2d 1359 (1981).

**{¶30}** Powell is correct in noting that the jury could not consistently find him guilty of aggravated murder but not guilty of murder. The court recognized this when

reading the jury's verdict — it immediately stopped, informed the parties of the inconsistency, and asked if the defense wished to have the jury correct the verdict form. Defense counsel stated "we can make an objection at another time I mean after [sic]." The court proceeded to read the verdict form and poll the jurors. Powell did not offer any further objection to the inconsistency in the verdict form. He thus waived any error for purposes of appeal. *State v. Williams*, 51 Ohio St.2d 112, 364 N.E.2d 1364 (1977), paragraph one of the syllabus ("An appellate court need not consider an error which a party complaining of the trial court's judgment could have called, but did not call, to the trial court's attention at a time when such error could have been avoided or corrected by the trial court.").

II

A

{¶31} The first subset of trial errors claimed by Powell fall into the broad category of evidentiary errors.

1

{¶32} Powell first addresses the letter that was confiscated by jail authorities by arguing that there was no proof he drafted the letter. The letter was submitted to an expert for handwriting analysis, but the expert could not offer an opinion that Powell drafted the letter. Nevertheless, the court permitted the detective who carried out the investigation in the case to offer her opinion that Powell purposely altered his handwriting in the exemplar he provided to the expert. Powell argues that the detective

had no qualifications to express that opinion, so the court erred by allowing her testimony to that effect. In addition, Powell argues that witnesses who claimed to recognize Powell's writing offered no evidence to give a basis for that knowledge.

{¶33} Evid.R. 901(A) states the basic proposition that the proponent of evidence must authenticate or identify that evidence by showing that the matter in question is what its proponent claims. Authentication under Evid.R. 901 is a low threshold — the rule requires only a prima facie showing of genuineness and leaves it to the jury to decide the true authenticity and probative value of the evidence. *State v. Toudle*, 8th Dist. Cuyahoga No. 98609, 2013-Ohio-1548, ¶ 21.

{¶34} An expert from the Bureau of Criminal Identification and Investigation examined the letter, a pro se motion handwritten by Powell, and a handwriting exemplar Powell provided. The expert reported that she was forced to disregard the handwriting exemplar because it contained "elements characteristic of unnatural writing." A police detective who requested the handwriting exemplar stated her belief that Powell was trying to disguise his handwriting and for that reason asked that copies of pro se motions signed by Powell be submitted to the expert.

{¶35} Despite the expert's failure to form an opinion as to whether Powell wrote the confiscated letter, two state witnesses who were friends of Powell's and claimed to be familiar with Powell's handwriting (including the person to whom a portion of the letter was addressed), testified that they recognized Powell's handwriting on the letter. Evid.R. 901(A) requires only that the proponent of the matter offered produce evidence

"sufficient to support a finding that the matter in question is what the proponent claims it to be." In other words, the state did not need to definitely prove that Powell wrote the letter as a predicate to it being admitted, but that a trier of fact could find, based on the evidence, that Powell wrote the letter. *State v. Easter*, 75 Ohio App.3d 22, 25, 598 N.E.2d 845 (4th Dist.1991). Non-expert witnesses who claim firsthand knowledge of another's handwriting can authenticate handwriting. *State v. Shakoor*, 7th Dist. Mahoning No. 01 CA 121, 2003-Ohio-5140, ¶ 81. The testimony by witnesses who claimed to know Powell's handwriting was enough to meet the threshold level of admissibility under Evid.R. 901. It was left to the jury to consider whether the witnesses credibly claimed to have firsthand knowledge of Powell's handwriting.

2

{¶36} Powell argues that the court should not have allowed the detective, who was not qualified as an expert in handwriting analysis, to express her opinion that Powell "was trying to disguise his handwriting."

{¶37} This argument does not properly put the detective's testimony in context. The detective did not give her opinion that Powell was attempting to disguise his handwriting when giving the exemplar, only that she suspected him of doing so because he appeared to be writing with an unusual slant and in an unusual manner. For example, she testified that she was present when Powell gave the handwriting exemplar and that when forming the letter "C," Powell began from the bottom and wrote up instead of

starting from the top and going down. In addition, the detective said it took Powell an inordinate amount of time to complete a very short, two-page exemplar.

{¶38} The detective's testimony was largely confirmed by the state's expert. Although the expert could not state an opinion that Powell wrote the letter, the expert said that the exemplar provided by Powell contained "unnatural" writing. She described the writing as lacking a smoothness of script — the writing showed a "tremor" and was "shaky." The expert said there were two possible reasons for the tremor: the person giving the exemplar either suffered from a form of palsy or was making a deliberate attempt to disguise the handwriting. Again, the expert said that she could not form an opinion as to which of these two reasons explained Powell's exemplar, but there was no credible evidence that Powell had any sort of tremor or palsy. Powell claimed that the exemplar did not contain his normal handwriting because he was "scared" of the detective who oversaw the exemplar and his fear made him shake and lose control over his right arm. The jury could have reasonably rejected Powell's alleged fear as a reason for why the handwriting exemplar appeared as it did. Powell completed the exemplar in the company of his attorneys. There was no suggestion from the detective that the atmosphere in the room at the time was so overbearing as to cause Powell to quake in fear. Indeed, Powell's explanation was so dubious that, viewed in conjunction with the contents of the letter itself, the jury could reasonably conclude that Powell wrote the letter and then tried to manipulate the handwriting exemplar to hide the fact that he wrote the letter.

**{¶39}** Powell next argues that the court erred by allowing witnesses to read to the jury portions of the letter that was improperly attributed to him, was prejudicial, and constituted hearsay.

**{¶40}** Having found that the state offered sufficient evidence to authenticate the letter, we have no basis for finding that the court erred by allowing witnesses to read the letter. What is more, with the state having met the threshold for admissibility, the contents of the letter were fair game for inquiry. The letter written by Powell would not be considered hearsay insofar as various statements in it constituted admissions against interest for purposes of Evid.R. 801(D)(2)(a).

B

**{¶41}** The next subset of assigned trial errors relate to the state's alleged misconduct throughout trial.

**{¶42}** During Powell's direct examination, defense counsel asked him if he had any "convictions for any type of federal or state offenses[.]" Powell replied, "[a]s an adult, no, sir." On cross-examination, the state asked Powell to recall when his attorney asked him about prior felony convictions. Powell said that he did recall that question and that he answered "no." The prosecuting attorney replied, "[t]hat's not what you said." Powell responded, "I said nothing adult." Over objection by defense counsel, the prosecuting attorney then asked Powell, "[w]ell, does that mean you had something in Juvenile Court?" The court convened at sidebar and heard defense counsel object on the

basis that the state was attempting to impeach Powell with his juvenile record. The state maintained that Powell opened the door to impeachment with his juvenile record. The court agreed with the state, but the state then said it would "leave it alone" and move onto other matters.

**{¶43}** Ordinarily, the state may attack the credibility of an accused with evidence that the accused was convicted of a crime punishable by imprisonment in excess of one year. *See* Evid.R. 609(A)(2). However, Evid.R. 609(D) provides an exception to the general rule and states that "[e]vidence of juvenile adjudications is not admissible except as provided by statute enacted by the General Assembly." R.C. 2151.357(H) similarly prohibits the use of juvenile adjudications to impeach: "Evidence of a judgment rendered and the disposition of a child under the judgment is not admissible to impeach the credibility of the child in any action or proceeding." While a witness's bias may sometimes be a proper basis for using a juvenile record, *Davis v. Alaska*, 415 U.S. 308, 321, 39 L.Ed.2d 347, 94 S.Ct. 1105 (1974) (Stewart, J., concurring), impeaching the credibility of a witness with a juvenile record is not allowed. *State v. Winston*, 8th Dist. Cuyahoga No. 81436, 2003-Ohio-653, ¶ 11.

**{¶44}** The defendant may, however, voluntarily introduce his juvenile history. In *State v. Marinski*, 139 Ohio St. 559, 41 N.E.2d 387 (1942), the syllabus states: "When a defendant in a criminal case is permitted to introduce evidence of his life history, he waives the protection of the [predecessor of R.C. 2151.357] and may be cross-examined

with reference to the disposition of any charge preferred against him as a juvenile." *See also State v. Cox*, 42 Ohio St.2d 200, 327 N.E.2d 636 (1975).

**{¶45}** In *State v. Phillips*, 8th Dist. Cuyahoga No. 96329, 2012-Ohio-473, we recently considered a fact pattern very similar to the one presented in this appeal. Phillips, the defendant, testified on direct examination that he had never been in trouble "as an adult," had been in trouble "as a juvenile only twice," but "really wasn't never [sic] convicted." *Id*. at ¶ 60. The state cross-examined Phillips about his juvenile record and he complained on appeal that the state's questioning violated Evid.R. 609(D) and R.C. 2151.357(H). We held that Phillips voluntarily testified about his "life history" so the state was permitted, under authority of *Marinski*, to question him about his juvenile adjudications. *Id*. at ¶ 61.

**{¶46}** *Marinski* and *Phillips* control. When asked about criminal convictions, Powell qualified his answer by stating that he had none "as an adult." This answer allowed the state to inquire whether Powell had "something in Juvenile Court?" And not only was there no error in the state's question, but little likelihood of prejudice because the state voluntarily abandoned Powell's juvenile record and moved on to another line of questioning.

C

**{¶47}** At one point during the state's case, the court recessed for the day and admonished the witness on the stand, Kelvin Lester, not to discuss his testimony with anyone. When the court reconvened, the state informed the court that it had come to

learn that Lester had a conversation with the state's previous witness, Gregory Tate (no relation to victim Cedric Tate), in violation of the court's order not to discuss his testimony. Tate claimed that during their conversation, Lester admitted that some of his testimony in court was not truthful. The state told the court that when it learned about the conversation, it confronted Lester, who denied that he discussed his trial testimony with Tate, much less that he had not testified truthfully. The court conducted a voir dire of Lester who denied having said that he testified untruthfully. Lester did, however, admit that he spoke with Tate on the telephone and they discussed how Lester's brother had also testified at the trial and that "you guys was in here with [Lester's brother] asking him a lot of questions." Lester told the court that Tate did not tell him about the content of the brother's testimony. He said he called Tate because they were friends and he wanted Tate to get marijuana for him. He continued to insist that they did not discuss the case. The court was unconvinced and told Lester so. Lester then admitted that he and Tate did discuss the case, but that he had testified truthfully and intended to continue to do so. The defense then asked the court to declare a mistrial or, barring that, to strike Lester's testimony as a consequence of his failing to obey the court's order not to discuss the case. The court then questioned Tate's mother. She testified in voir dire to the court that Tate, who had been present during Lester's testimony, told her that Lester had lied during his testimony. The mother said that she was the one who urged Tate to confront Lester. The court denied the mistrial and allowed Lester to continue with his testimony, subject to cross-examination by the defense regarding his conversation with Tate.

**{¶48}** Evid.R. 615(A) states in part: "at the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion." The similar (though not identical) Fed.R.Evid. 615 has been construed to prohibit witnesses from discussing their testimony, or what has occurred at trial, with other witnesses who have not yet testified. *See United States v. Greschner*, 802 F.2d 373, 375-376 (10th Cir.1986). While both the Ohio and federal rules are written in mandatory language (the court "shall" order witnesses excluded), enforcement of a violation of the rule is subject to the court's discretion. So not only must a party complaining of a violation of Evid.R. 615(A) show prejudice, but must also show that the court abused its discretion in dealing with a violation of the rule. *United States v. Womack*, 654 F.2d 1034, 1040 (5th Cir.1981).

**{¶49}** While it is certainly true that Lester violated the court's order not to discuss the case with anyone, there is no indication that Powell suffered any prejudice from the violation. In fact, Powell makes no argument on appeal as to why his rights were violated; instead, he appears to assume prejudice without explanation or citation to legal precedent. The court conducted a lengthy voir dire of Lester and allowed both the state and defense to question him. The court then told Powell's counsel that he could cross-examine Lester with respect to the violation of the court's order. Powell's counsel did so comprehensively. Indeed, counsel cross-examined Lester to the point where we are unable to say that excluding Lester's testimony would have been more effective than the withering cross-examination he endured at the hands of defense counsel.

# D

**{¶50}** Powell offers a lengthy list of occasions when the state allegedly asked leading questions of its witnesses, notably on whether a "cap" could, in addition to the meaning ascribed by the witness, be understood to be a bullet.

**{¶51}** In *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-508, 854 N.E.2d 1038, the Ohio Supreme Court quoted 1 McCormick, *Evidence*, Section 6, at 19 (5th Ed.1999), for the proposition that "[a] leading question is 'one that suggests to the witness the answer desired by the examiner.'" *Id*. at ¶ 138. Leading questions are generally barred by Evid.R. 611(C) unless necessary to "develop" testimony, but the trial judge has discretion to allow leading questions on direct examination. *Id*., citing *State v. D'Ambrosio*, 67 Ohio St.3d 185, 190, 616 N.E.2d 909 (1993).

**{¶52}** Most of the questions cited to by Powell were not leading questions. The assistant prosecuting attorney utilized a style of questioning that tended to start each question with a rephrase of that to which the witness previously testified. For example, one witness testified that he saw Powell through the crowd of people that left the house after Brown's body was discovered in the basement. A ringing cell phone necessitated a short interruption in the testimony, and when the state resumed questioning it stated, "[n]ow, you just told us you saw [Powell] through the crowd as people are running out and after Wayne screams [Powell] killed Tre; is that right?" Tr. 1918-1919. The question was not leading — it simply tried to place the previous questioning in the mind of the witness so the state did not have to redevelop the testimony.

{¶53} In another example, a witness testified that he heard another person yell that Powell killed Tate. When the witness saw Powell standing in the doorway of the house, the witness began backing slowly away from the porch of the house. The state asked, "[s]o then Wayne runs out and screams that [Powell] killed Tre, and you start backing up like this, down the steps and back down that sidewalk?" This question was nothing more than a restatement of the witness's testimony for emphasis. Although such statements made by the prosecuting attorney can serve to reinforce the witnesses' testimony, it was not leading.

{¶54} Powell's argument is thus one attacking style, not substance. The court recognized this, telling the parties that it would allow both the defense and the assistant prosecuting attorney to "pursue the questions the way you want in the manner that you desire to do it[.]" It was within the court's discretion to allow the questioners this type of freedom. *See State v. Heinish*, 50 Ohio St.3d 231, 239, 553 N.E.2d 1026 (1990).

E

{¶55} During trial, the state called Taylor Howard, Powell's girlfriend who stayed with him at a motel following the murders, to testify. When the court recessed on Friday evening, Howard had not completed her testimony, so the court gave her the standard admonishment not to discuss her testimony with anyone. Defense counsel asked the court for an order that she not make any telephone calls to Powell over the weekend recess, but the court believed that Howard, who claimed not to have discussed the murders with Powell during the three-day motel stay with him, was capable of not

discussing her testimony. The court was wrong: the state learned that Powell called Howard from jail. All jail telephone conversations are recorded, and those recordings showed not only that Powell and Howard discussed the case in violation of the court's admonishment (Powell said "they told me not to [call], but I'm not going to let them scare we [sic] away from my girl"), but that they discussed testimony by other witnesses. The recording reveals that Powell was unhappy with the testimony of some of the witnesses and that when they left off the witness stand, he could have "dogged" them. In light of Howard's violation of the court's admonishment, the court designated Howard a hostile witness and allowed the state to impeach her.

**{¶56}** Powell complains that the court improperly designated Howard as hostile, but he makes no specific argument other than to say that "Howard willingly testified and there was no surprise or affirmative damage established by the state." This argument is insufficient for purposes of App.R. 16(A)(7). That rule requires an appellant's brief to contain an argument and the reasons in support of that argument. The single sentence in support of the contention that the court improperly declared a state witness to be hostile contains conclusions, not arguments.

**{¶57}** The court's decision to declare Howard "hostile" was inconsequential because the state had the right to attack Howard's credibility without a showing of surprise and affirmative damage. Evid.R. 607(A) states:

> The credibility of a witness may be attacked by any party except that the credibility of a witness may be attacked by the party calling the witness by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage.

**{¶58}** The rule makes it clear that "any" party can attack the credibility of a witness. As the advisory committee notes to the analogous Fed.R.Evid. 607 state, "[a] party does not hold out his witnesses as worthy of belief, since he rarely has a free choice in selecting them. Denial of the right leaves the party at the mercy of the witness and the adversary." Because parties may not have the choice of selecting witnesses, they often impeach these own witnesses as a way of "[m]inimizing the 'sting' of an opponent's impeachment[.]" *United States v. Ewings*, 936 F.2d 903, 909 (7th Cir.1991).

**{¶59}** In this case, the state did not impeach Howard with a prior inconsistent statement; instead, it impeached her credibility by showing that she and Powell discussed the case despite her having been told by the court not to discuss her testimony with anyone. It is important to note that the state did not call Howard as a witness for the sole purpose of having her give otherwise inadmissible testimony. She had been on the witness stand before she engaged in telephone conversations with Powell which, in turn, called her credibility into question. There was thus a proper basis for impeachment.

F

**{¶60}** The next subset of alleged trial errors raises issues of prosecutorial misconduct. Powell complains that the state's closing argument inflamed the jury's passions; that the state made an improper comment on his pre-arrest silence; and that the state expressed opinions on the credibility of certain witnesses.

1

**{¶61}** During closing argument, the state made the following remarks:

So when you go back and deliberate, I want you to remember the images of TreVaun Brown and Cedric Tate lying dead in the defendant's house. You've got the coroner's photographs of their wounds, the gunshots, what happened to them, but it's not the only way I want you to think about them. * * * These were two young men with families, mothers you heard from in the courtroom.

* * *

A murder is unique in that it abolishes the party it injures so that society has to take the place of the victim and on his behalf demand atonement.

* * *

[Murder] is the one crime in which society has a direct interest.

**{¶62}** Powell argues that these remarks were improper because they appealed to the jury's passion by asking them to correct some social wrong.

**{¶63}** The "conduct of a prosecuting attorney during trial cannot be made a ground of error unless that conduct deprives the defendant of a fair trial." *State v. Maurer*, 15 Ohio St.3d 239, 266, 473 N.E.2d 768 (1984). A defendant is only entitled to a new trial on the basis of a prosecutor's remarks when those improper remarks substantially prejudice the defendant. *State v. Tibbetts*, 92 Ohio St.3d 146, 749 N.E.2d 226 (2001).

**{¶64}** The state's remarks that murder is "the one crime in which society has a direct interest" and that a murder forces "society to take the place of the victim" were taken from the English poet W.H. Auden. It may be that the English system of prosecuting crimes is different, but in Ohio the state has a direct interest in all crimes. Section 20, Article IV, of the Ohio Constitution encapsulates this point by requiring all offenses be charged "against the peace and dignity of the State of Ohio." Thus, all

crimes are prosecuted in the name of the people, not the victim, and crimes are prosecuted regardless of their levels of seriousness. The state's suggestion that it was required to prosecute the case because it was murder and the victims were unavailable, was overwrought with inaccuracy, if not entirely inaccurate, but nonetheless within the "degree of latitude" we give the parties in their concluding remarks. *State v. Liberatore*, 69 Ohio St.2d 583, 589, 433 N.E.2d 561 (1982).

{¶65} More troublesome was the state's request that the jury recall the photographs showing the bodies of the two victims and not think about them in their deceased state, but to think about them in connection with their families and mothers. In objections placed on the record, Powell noted that when the state made this comment, it projected side-by-side images of both Brown and Tate when they were alive, with their dates of birth and dates of death under each image. According to defense counsel, these images elicited crying from the back of the courtroom, a contention that the state did not contest. The state argued that it offered testimony by the mothers of both victims so it was "merely restating the evidence that was presented at trial * * *."

{¶66} By showing photographs of the two victims with their dates of birth and dates of death and asking the jury to consider the victims and their mothers, the state made a blatant and maudlin appeal to the passion of the jury. This was improper and should not have been permitted by the trial court. The state's rationale for doing so — that the mothers of the victims testified and it was restating evidence — is unconvincing. Asking the jury to think of the victims as they were when they were alive was so

irrelevant to the murder charges, we can only conclude that the state's sole purpose was to appeal to the emotions of the jury — a goal it must have realized when the photographs apparently elicited crying from family members and/or friends of the victims who attended the trial.

{¶67} Despite the court's error in allowing the state's remarks and the photo display, we are unable to say that the remarks deprived Powell of a fair trial. Although the court refused to strike the remarks, it did state that it did not believe the remarks affected Powell's right to a fair trial. We previously noted the strength of the state's evidence against Powell and need not restate that evidence. Why the state believed it needed to resort to this kind of final argument (and why the court permitted it) is unclear. Apart from the remarks being improper, they were unnecessary in light of all the evidence. But the fact that they were unnecessary shows that there was no substantial prejudice to the defense.

2

{¶68} In another part of its closing argument, the state said that Powell skipped town and hid out at a motel following the murder. It went on to say that Powell "never contacts the police department prior to an arrest warrant being issued." Powell maintains that this statement amounted to an impermissible comment on his pre-arrest silence.

{¶69} In *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, the Ohio Supreme Court found improper a comment during closing argument that a defendant refused to come in and assist the police as being a comment on a defendant's

prearrest right to remain silent. The court concluded that the statement implied that the defendant "had something to hide by not turning himself in and telling the police what happened." *Id*. at ¶ 159.

{¶70} For the same reasons, we find the state's remark in this case improper but once again do not find the remark so prejudicial as to require a new trial. As the state notes, Powell testified at trial to the events occurring after the murder, including his stay at the motel. He said on direct examination that he met an attorney at the motel and learned that the police were attempting to obtain an arrest warrant for him. He decided to turn himself in to the police if and when the police obtained an arrest warrant. While the state should not have implied that Powell could have turned himself in to the police before the issuance of an arrest warrant, the jury knew full well the circumstances of Powell's stay at the motel. The state's remarks did not tell the jury anything that Powell himself did not admit to in his testimony, so those remarks could not have prejudiced him.

3

{¶71} Referencing the letter intercepted by jail authorities and believed by the state to have been written by Powell, the state told the jury that "[h]e sits here in court yesterday and lies to you about the letter after his own best friend comes into court and identifies his handwriting." Powell argues that this amounted to the state giving an opinion on his credibility.

{¶72} "It is improper for an attorney to express his or her personal belief or opinion as to the credibility of a witness or as to the guilt of the accused." *State v.*

*Williams*, 79 Ohio St.3d 1, 12, 679 N.E.2d 646 (1997). In this case, we do not conclude that the prosecuting attorney gave a personal opinion that Powell lied when denying having written the letter, but that the evidence would permit the jury to reach that conclusion. Admittedly, the word "lies" carries with it the connotation of purposeful deception, making the use of that word problematic. But suggesting to the jury that Powell lied was a fair characterization of the evidence, and no less different than if the state had simply said that Powell's testimony lacked credibility.

{¶73} We reach this conclusion because Powell repeatedly testified on cross-examination that the state's expert's inability to give an opinion on the writing exemplar "proved" that he did not write the letter intercepted by jail authorities. During his closing argument, Powell's attorney appeared to back off that absolutist position — he made no argument specifically denying that Powell wrote the letter. Instead, defense counsel countered the state's theory that Powell wrote the letter by focusing on the absence of proof beyond a reasonable doubt of that fact (for example, noting the state's failure to conduct DNA testing on the paper or envelope). This being the case, the state could validly rebut defense counsel's closing argument by suggesting that the jury could view Powell's testimony as "lies."

G

{¶74} The next set of alleged errors relates to the admission of evidence and raises issues of hearsay, relevancy, and other acts evidence.

1

**{¶75}** State's witness Bernard Patterson was at the house during the shootings and testified that as he and the others fled from the house after discovering that Brown had been killed, he heard someone else say in a "high-pitched scream" that "Bravo [Powell's nickname] killed Tre." In a single-sentence, Powell argues, without citation to any authority, that this statement "was improper and violated Appellant's right to a fair trial and due process."

**{¶76}** Powell has not set forth a separate argument with citation to any authority, so we can disregard this part of the assignment of error on that basis alone. *See* App.R. 16(A)(7). In any event, the statement was properly allowed as an exception to the hearsay rule as an excited utterance under Evid.R. 803(2). The evidence showed the existence of a startling event (the discovery of Brown's body), the statement was contemporaneous with the startling event, the statement related to Brown's death, and the declarant personally observed the circumstances leading to the conclusion that Powell killed Brown. *See Potter v. Baker*, 162 Ohio St. 488, 124 N.E.2d 140 (1955), paragraph two of the syllabus.

2

**{¶77}** In response to the question "[w]hat was TreVaun's relationship with the defendant leading up to this murder," a state witness testified over objection that "Johnny didn't like TreVaun." She then went on to say that she knew this because Brown told her that he knew "that * * * Johnny feel[s] a certain type of way about me." The court

sustained an objection to that statement. Powell argues that this was inadmissible hearsay.

{¶78} The first statement that "Johnny didn't like TreVaun" was not hearsay because it was not an out-of-court statement offered to prove the truth of the matter asserted. *See* Evid.R. 801(A). It was an opinion offered by a witness with knowledge of the facts.

{¶79} The second statement that Brown told the witness that he knew Powell did not like him because Powell felt a "certain way" about him was hearsay because it was an out-of-court statement by Brown offered to prove that Powell did not like him. The court properly sustained an objection to that statement, so it was not allowed into evidence.

3

{¶80} Two 911 calls made to the police after shots were fired at Powell's house were played to the jury. Powell complains that the calls were inadmissible hearsay and violated his right to confrontation because the state was unable to authenticate the calls and because he was unable to cross-examine the person or persons making the 911 calls.

{¶81} In *State v. Cooper*, 8th Dist. Cuyahoga No. 96635, 2012-Ohio-355, we stated:

> In *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States Supreme Court held that when a statement that is otherwise admissible under an established hearsay exception is "testimonial" in nature, the Confrontation Clause of the Sixth Amendment "demands what the common law required: unavailability and a prior opportunity for cross-examination." *Id*. at 68. The supreme court did not define what constitutes a "testimonial" statement, but in *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), it held

that statements are "non-testimonial" when the circumstances objectively indicate that the primary purpose of the interrogation is to respond to an "ongoing emergency" and not to establish or prove past events potentially relevant to later criminal prosecution.

*Id*. at 822.

**{¶82}** Nothing in the 911 calls could be legitimately classified as testimonial in nature. The first call did nothing more than report gunshots fired in the neighborhood and inform the police that there was an occupied car parked on the street. The second caller was even less testimonial — he, too, reported gunshots having been fired, but was unable to give the 911 operator an accurate address, so the call terminated. In neither 911 call was anything of substance stated for the truth of the matter asserted, so they were not hearsay.

**{¶83}** Even if the statements were hearsay, they were not barred under the Confrontation Clause. The Confrontation Clause applies only to testimonial statements — that is, statements made "under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *State v. Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, paragraph one of the syllabus; *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, at ¶ 161. Neither statement was made under circumstances in which an objective witness would reasonably believe that the statements would be used at trial. The callers were simply concerned citizens reporting that they heard gunshots. The callers had nothing to offer on the source of the shots and were doing nothing more than reporting an ongoing emergency, so the calls were nontestimonial in nature.

**{¶84}** During Powell's direct examination, he began to testify to conversations he had after the shootings with a friend who had been present at the house when the shootings occurred. When Powell began to relate that the friend told him "what people was assuming" about the shootings, the state objected. The court sustained the objection. Powell then said that he told the friend that the friend "knew I didn't do it but what he told me was —." The state again objected, and the court again sustained the objection. At a sidebar, Powell's counsel stated that Powell understood that the state was objecting on hearsay grounds, but argued that Powell was entitled to state the substance of his conversation with the friend because it explained why he stayed in the motel for two days after the murders. Noting that the friend had testified about the same conversation, Powell maintained that he "should be able to explain what the [give] and take of these conversations is" — essentially, an argument to explain why he stayed in a motel after the murders and not for the truth of the matter asserted.

**{¶85}** Evid.R. 103(A)(2) requires an offer of proof in order to preserve any error in excluding evidence, unless the excluded evidence is apparent in the record. Powell did not proffer what his testimony would have been, so he waived any error for review. *State v. Grubb*, 28 Ohio St.3d 199, 503 N.E.2d 142 (1986), paragraph two of the syllabus.

**{¶86}** Despite not proffering what his testimony would have been, the record shows that Powell did testify as to why he went to the motel. As defense counsel noted

during the sidebar discussion of this issue, Powell could, in light of his conversation with the friend, testify as to what he learned in the course of that conversation and to what he did as a result of the conversation. Powell did just that: he testified that as a result of his conversation with the friend, he called his mother and told her that "I don't feel safe." At that point, Powell stated that arrangements were made for him and his mother to both get motel rooms — the mother, too, needed a motel room according to Powell because "they wasn't safe due to the things I was hearing." Powell said that he consulted with a lawyer and decided to stay at the motel until a warrant was issued for his arrest.

{¶87} By testifying that he went to the motel after the shooting because he believed he was in danger, Powell was able to explain his actions. In doing so, he removed any prejudice attendant to the court's sustaining the state's objections that he was testifying to hearsay.

5

{¶88} A number of those present during the shooting used their cell phones shortly thereafter. The police obtained information from the cell phone carriers of those persons, including Powell, and created a map that purported to track Powell's movements following the murders by showing which cell phone towers handled his calls. A representative from a cell phone company testified that cell phone calls are not necessarily routed through the nearest cell phone tower, so it would be difficult to use information relating to cell towers to pinpoint the location of a caller. For this reason, Powell argues that the court should have excluded the evidence.

**{¶89}** "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. "All relevant evidence is admissible. Evid.R. 402. Even though evidence might be relevant, it must be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A). It is up to the court to decide initial questions of admissibility, *see* Evid.R. 104(A), and we will not disturb those rulings unless the court abused its discretion by admitting the evidence. *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 172.

**{¶90}** There was little probative value of the map that purported to track the locations of cell phone towers through which Powell's cell phone calls were routed. The cell phone company representative testified that trying to do so yielded a "guesstimate" because the signal from a cell phone would not necessarily go to the nearest cell phone tower. The location of a cell phone tower might be as far as "a couple of miles" away, making any attempt to create a map based on the location of the tower that handled the signal from the cell phone nothing more than guesswork. The police officer who compiled the cell phone data into a map conceded the point and said that the map would only show "the phone call at that particular time hit off that cell site."

**{¶91}** For these reasons, the court had no plausible basis for admitting the map of cell phone tower "hits" prepared by the police. But the error in admitting the map was harmless. The police officer who prepared the map was unable to offer a response when

told that the cell phone company representative essentially contradicted the training given to the police officer regarding how cell phone signals were routed through cell phone towers. That compromised the credibility of the officer and made the map useless in a way that exceeded the benefit to be had from the court excluding the exhibit. We can find no prejudice from the court's decision to admit the map.

6

{¶92} Although Powell referred to Taylor Howard as his "girlfriend," he apparently dated another woman at the same time. He now complains that the state offered evidence of his relationship with the other woman for the sole purpose of portraying him in a bad light. He argues that this evidence was admitted in violation of Evid.R. 404(B).

{¶93} The Evid.R. 404(B) prohibition against the introduction of evidence of "other crimes, wrongs, or acts" to prove the character of a person and that he acted in conformity with those prior acts is based on relevancy — the rule recognizes the danger that the jury will convict the defendant solely because it assumes that the defendant has a propensity to commit criminal acts, or deserves punishment regardless of whether he or she committed the crimes charged in the indictment. *State v. Cotton*, 113 Ohio App.3d 125, 131, 680 N.E.2d 657 (1st Dist.1996).

{¶94} The state did not offer the woman's testimony to prove that Powell must have committed the murders because he cheated on women. There was simply no connection between the murders and any infidelity of Powell's to a girlfriend, nor was

there any danger that the jury would have made that connection. Instead, the state offered the woman as a witness for the purpose of showing Powell's activity following the murder. It confronted her with cell phone records showing that she received a telephone call from Powell's cell phone at 3:27 a.m. on the night the murders occurred and that the woman called Powell's phone more than 110 times between 12:32 a.m. and 1:11 p.m. on February 19, 2012. The woman did not recall receiving the late call from Powell even though the call logs showed that the call lasted 63 seconds. She further testified that she did not recall that she called Powell more than 100 times in a 12-hour period on the day after the murders occurred. The witness did concede that she regularly visited Powell in jail after his arrest, thus casting doubt on her inability to recall the specifics of telephone calls Powell made so soon after the murders.

H

{¶95} Powell next cites three separate examples that he claims prove that defense counsel performed ineffectively.

1

{¶96} The state's expert on handwriting analysis stated that she could not state to a reasonable degree of scientific certainty that the handwriting of the exemplar provided by Powell matched the handwriting of the letter confiscated by the jail authorities. Powell argues that defense counsel should have cross-examined those witnesses who claimed to recognize his handwriting with comparisons of his writing because there was a reasonable

probability that if so cross-examined, they would have realized that Powell did not write the letter.

{¶97} An ineffective assistance of counsel claim will lie only when it is shown that both (1) the performance of defense counsel was seriously flawed and deficient, and (2) the result of the defendant's trial or legal proceeding would have been different had defense counsel provided proper representation. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

{¶98} It is difficult to conclude that defense counsel acted deficiently by failing to show Powell's friends the handwriting exemplar and asking if they recognized that as Powell's writing. With the state's expert unable to give an opinion that the writing on the exemplar was the same writing as that on the letter, Powell could not hope to do better. The handwriting analyst's opinion was an expert opinion — one that Powell used to great advantage in his defense. It is important to bear in mind that the state's expert left open the possibility that Powell wrote the exemplar in a way that indicated he manipulated it. It was thus entirely possible that Powell's friends may have looked at the exemplar and rejected it as a poor attempt to mask Powell's true handwriting. Defense counsel could have validly chosen not to risk that possibility.

2

{¶99} During direct examination, Powell claimed that he went to his "girl's" house after learning about the murders. Two friends visited him there. In conversations with those friends, he said he learned "what people was assuming" about the murders and that

"I told Wayne that he knew I didn't do it but what he told me was —." Objections to both statements were sustained and the court rejected Powell's argument that he could testify to hearsay because both friends previously testified for the state and were subject to cross-examination. Powell argues that this testimony was necessary to counter the state's assertion that he engaged in flight following the murders by hiding out in a motel. He also argues that if the court was correct in refusing to allow the hearsay, defense counsel was deficient because he should have cross-examined those friends on the same testimony he wished to offer during his direct examination.

{¶100} Powell offers no argument of any kind that the out-of-court statements to which he was about to testify were admissible hearsay. That being the case, he is forced to rely on the argument that trial counsel should have called those persons making the statements so that the testimony could be put before the jury. While that was certainly one option, it must be recognized that both witnesses testified for the state and gave damaging testimony against Powell. Trial counsel has no duty to cross-examine every witness and the strategic decision not to cross-examine witnesses "is firmly committed to trial counsel's judgment." *State v. Otte*, 74 Ohio St.3d 555, 565, 660 N.E.2d 711 (1996). Even if defense counsel had the duty to cross-examine the friends, Powell gives no basis on which we could conclude that they would have given testimony that would change the outcome of trial in any sense that could be considered favorable to him.

3

{¶101} For the same reasons, we reject Powell's next argument that defense counsel should have called Lisa Patterson and Gregory Tate in his case-in-chief. Both witnesses admitted in voir dire before the court that they discussed their testimony during the trial in violation of the court's admonition not to do so. Powell claims it is "reasonably probable" that had defense counsel called them as witnesses for the defense, their testimony in that regard could have changed the outcome of trial.

{¶102} As with the previous argument, Powell provides no specific reason why he believes that Patterson and Tate could have provided testimony that would have changed the outcome of the case. The events about which both witnesses were questioned occurred after the murders when those present at the house were scrambling to their cars, so their testimony would not have been probative of guilt.

III

{¶103} The final set of arguments raises sentencing issues.

A

{¶104} Powell first argues that the kidnapping counts for both victims should have merged into the respective murder counts for sentencing because the restraint employed in both cases was incidental to the murders.

{¶105} When a defendant's conduct results in the commission of two or more "allied" offenses of similar import, that conduct can be charged separately, but the defendant can be convicted and sentenced for only one offense. R.C. 2941.25(A). Offenses are "allied" and must be merged for sentencing if the defendant's conduct is

such that a single act could lead to the commission of separately defined offenses, but those separate offenses were committed with a state of mind to commit only one act. *See State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, ¶ 48-50. Merger is a sentencing issue and the defendant bears the burden of establishing his entitlement to the protection of the Allied Offenses Statute, R.C. 2941.25. *State v. Washington*, 137 Ohio St. 3d 427, 2013-Ohio-4982, 999 N.E.2d 661, ¶ 18.

{¶106} Beginning first with the kidnapping count relating to Brown, our conclusion that the state failed to offer proof sufficient to prove kidnapping as charged in Count 3 necessarily moots the allied offenses argument relating to that count.

{¶107} As for the kidnapping charge against Tate contained in Count 6, we agree that the evidence showed that it was committed with the same animus as the aggravated murder. The evidence showed that Powell physically restrained Tate from leaving the house after the discovery of Brown's body in the basement and that gunshots followed just "a few seconds" later. Crucial to our conclusion that the kidnapping was committed with the same state of mind to commit murder is testimony that Powell told Tate, "ain't nobody going anywhere." At the time Powell made this statement, he and Tate were the only people left in the house. Powell's motive for shooting Tate was never established, but the evidence compellingly indicates that he restrained Tate for the sole purpose of killing him. We thus conclude that the kidnapping and murder counts should have merged for sentencing. We sustain this part of the assignment and order the case remanded so that the state may elect which of the two counts it desires to proceed with for

sentencing. *See State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, 922 N.E.2d 182, ¶ 21-24.

B

{¶108} In addition to sentences imposed on other counts, the court sentenced Powell to 15 years to life for Brown's murder and life without the possibility of parole for Tate's murder and ordered Powell to serve those sentences consecutively. Powell argues that there is no practical purpose in ordering him to serve consecutive life sentences, so the court abused its discretion.

1

{¶109} R.C. 2953.08 circumscribes appellate review of criminal sentences. Apart from limiting the type of errors that a defendant can claim on appeal, it places tight restrictions on how an appellate court may review claimed sentencing errors.

{¶110} As always, a court of appeals may correct errors of law. *See* R.C. 2953.08(A)(4). In the context of consecutive sentences, the sentencing court's failure to make the findings required by R.C. 2929.14(C)(4) constitutes an error of law that requires a remand so that the sentencing court can make the required findings. *See* R.C. 2953.08(G)(1).

{¶111} Questions concerning the exercise of the sentencing court's discretion are no longer viable. R.C. 2953.08(G)(2) makes it clear that "[t]he appellate court's standard for review is not whether the sentencing court abused its discretion." The decision to impose consecutive sentences resides solely in the sentencing court's discretion: R.C.

2929.14(C)(4) states that if multiple prison terms are imposed on an offender for convictions of multiple offenses, the court *may* require the offender to serve the prison terms consecutively. Because the decision to impose consecutive sentences is discretionary with the sentencing court, we have no authority to consider whether the sentencing court abused its discretion by ordering convictions for multiple sentences to be served consecutively. *State v. Thompson*, 8th Dist. Cuyahoga No. 99628, 2014-Ohio-202, ¶ 23.

{¶112} Nevertheless, a defendant can complain on appeal that the record does not support the sentencing court's findings under R.C. 2929.14(C)(4). *See* R.C. 2953.08(G)(2)(a). When properly raised, an argument that the record does not support the sentencing court's findings requires us to examine the record and increase, reduce, modify, or vacate a sentence if we clearly and convincingly find that the record does not support the findings. *Id.* This is an "extremely deferential standard of review" because the clear and convincing evidence standard is a restriction placed on the appellate court, not the sentencing court. *State v. Venes*, 2013-Ohio-1891, 992 N.E.2d 453, ¶ 21 (8th Dist.).

{¶113} Powell does not argue that the court failed to make the findings necessary to impose consecutive sentences, nor does he argue that the record fails to support the decision to impose consecutive sentences. The sentences were thus not contrary to law. Powell argues that the court did not properly consider the purposes and principles of sentencing, including factors in mitigation, but we can summarily reject this argument

because the court stated that it considered all required factors of the law. That statement was enough to fulfull the court's obligations under the sentencing statutes. *See State v. Kamleh*, 8th Dist. Cuyahoga No. 97092, 2012-Ohio-2061, ¶ 61.

2

{¶114} Powell also suggests that his sentence of life without parole constitutes cruel and unusual punishment and is disproportionate to his conduct. He does not independently argue this aspect of the assignment of error, so we can summarily reject it under App.R. 16(A)(7). But even had Powell offered a separate argument, it would not be persuasive. In *State v. Hairston*, 118 Ohio St.3d 289, 2008-Ohio-2338, 888 N.E.2d 1073, the syllabus states:

> Where none of the individual sentences imposed on an offender are grossly disproportionate to their respective offenses, an aggregate prison term resulting from consecutive imposition of those sentences does not constitute cruel and unusual punishment.

{¶115} Powell makes no argument that either of the individual murder sentences was grossly disproportionate to their respective offenses as those sentences were undeniably within the applicable statutory range for aggravated murder and murder. The court had the discretion to sentence within the statutory range, *id*. at ¶ 21, so ordering those sentences to be served consecutively did not violate the Cruel and Unusual Punishment Clause of the Eighth Amendment to the United States Constitution.

{¶116} This cause is affirmed in part, reversed in part, and remanded for resentencing to the trial court for proceedings consistent with this opinion.

It is ordered that appellant and appellee share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution. The defendant's conviction having been affirmed in part, any bail pending appeal is terminated. Case remanded to the trial court.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

---

MELODY J. STEWART, JUDGE

LARRY A. JONES, SR., P.J., and
EILEEN A. GALLAGHER, J., CONCUR