[Cite as *State v. Lamar*, 2022-Ohio-2979.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio

    Appellee

v.

Charles Lamar

    Appellant

Court of Appeals No.  WD-21-055
WD-21-056

Trial Court No.  2020CR0180
2020CR0243

**DECISION AND JUDGMENT**

Decided:  August 26, 2022

* * * * *

Paul A. Dobson, Wood County Prosecuting Attorney, and
David T. Harold, Assistant Prosecuting Attorney, for appellant.

Lawrence A. Gold, for appellant.

* * * * *

**DUHART, J.**

**{¶ 1}** This is a consolidated appeal filed by appellant, Charles Lamar, from the June 17, 2021 judgment of the Wood County Court of Common Pleas.  For the reasons that follow, we affirm the trial court's judgment.

{¶ 2} Appellant sets forth six assignments of error:

1. Indefinite sentencing under the Reagan Tokes Act is unconstitutional under the Fourteenth Amendment of the United States Constitution and the applicable sections of the Ohio Constitution.

2. The trial court erred by denying appellant's motion for mistrial.

3. The trial court erred and abused its discretion by allowing the state to introduce evidence of a third party that threatened M.B.

4. Appellant received ineffective assistance of counsel in violation of his rights under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, §10 of the Ohio Constitution.

5. The trial court erred by denying appellant's Crim.R. 29 motion.

6. The jury's verdict was against the manifest weight of the evidence presented at trial.

## Background - Statement of the Case

{¶ 3} Appellant and M.B. (or "the victim") met in 2015, while both were attending Bowling Green State University ("BGSU"), and they were in an on-and-off relationship for several years. On June 14, 2020, appellant was at M.B.'s apartment when the couple got into an argument, which then led to a series of incidents that occurred on June 15, 2020. As a result of those events, appellant was indicted, on June 25, 2020, on: Count One, rape with a sexually violent predator specification in violation of R.C. 2907.02(A)(2) and (B) and R.C. 2941.148(A), a felony of the first degree; Count Two,

2.

kidnapping with a sexual motivation specification and sexually violent predator specification in violation of R.C. 2905.01(A)(2) and (C)(1), R.C. 2941.147(A) and R.C. 2941.148(A), a felony of the first degree; Count Three, kidnapping with a sexual motivation specification and sexually violent predator specification in violation of R.C. 2905.01(A)(4) and (C)(1), R.C. 2941.147(A) and R.C. 2941.148(A), a felony of the first degree; Count Four, aggravated burglary in violation of R.C. 2911.11(A)(1)(B), a felony of the first degree; and Count Five, disrupting public services in violation of R.C. 2909.04(A)(3) and (C), a felony of the fourth degree. Appellant entered not guilty pleas.

{¶ 4} On March 23, 2021, a jury trial commenced. The state presented its case and after resting, defense counsel moved for acquittal pursuant to Crim.R. 29, which motion was denied. The defense then offered testimony and evidence. Thereafter, the jury found appellant guilty of: Count One, rape; Count Two, kidnapping; Count Three, kidnapping with the sexual motivation specification present; and Count Five, disrupting public services. Appellant was found not guilty of aggravated burglary.

{¶ 5} On March 31, 2021, a hearing was held on the sexually violent predator specifications, where the trial court found appellant not guilty.

{¶ 6} On June 3, 2021, a sentencing hearing was held. The court found the two kidnapping counts merged, and the state elected to proceed to sentencing on Count Three. Appellant was sentenced to eight years in prison for the rape conviction, five years in prison for the kidnapping conviction and one year in prison for the disrupting public services conviction. The rape and kidnapping sentences were ordered to be served

3.

consecutively and the sentence for disrupting public services was ordered to be served concurrently with the rape and kidnapping sentences.[1]  Appellant's definite minimum prison sentence was 13 years, and his indefinite maximum sentence was 17 years in prison.  Appellant timely appealed.

## Statement of the Facts

{¶ 7} At trial, the following evidence was presented.

## Katie

{¶ 8} Katie testified that she had been on the same sports team as M.B. at BGSU, and Katie was friends with M.B.  In June 2020, Katie lived in Bowling Green, Ohio, and she knew where M.B. lived in Bowling Green; Katie and M.B. lived about one mile away from each other.

{¶ 9} On June 15, 2020, at 5:30 or 6:00 in the morning, Katie was awakened by "very aggressive" knocking on the door.  She opened the door to find M.B. on the doorstep, wearing a shirt, sweatshirt, basketball shorts, one sock and no shoes.  M.B. did not have her phone, wallet, purse or car keys, and was "scared, crying, just panicked," and said, "CJ raped me."  Katie understood CJ was M.B.'s ex-boyfriend, appellant.  M.B. "instantly came through the door" and said her head was hurting a little bit.  Katie observed a bruise on M.B.'s leg.

---

[1]The sentence for disrupting public services was also ordered to be served concurrently with the sentence for a trespass conviction from another criminal case involving appellant.

4.

{¶ 10} M.B. asked to be driven to Ryann's house, who is also a former teammate. As the young women were driving to Ryann's house, they thought they saw appellant driving past, in the opposite direction, so they went straight to the hospital. Katie stayed at the hospital with M.B. until about 10:00 a.m., when M.B.'s parents arrived.

{¶ 11} On cross-examination, Katie testified she met with and was interviewed by Detective Cox, and told him that M.B.'s clothes looked normal, except for the sweatshirt. Katie acknowledged that, at first, M.B. did not want to go to the hospital and did not want to press charges.

{¶ 12} On redirect examination, Katie clarified that the first place that M.B. wanted to go was to Ryann's house. Katie also clarified that while they were driving to Ryann's house, they saw appellant driving in the opposite direction.

{¶ 13} On recross-examination, Katie admitted she did not know where appellant lived.

**M.B. - The Victim**

{¶ 14} M.B. testified that she lived in Bowling Green, Ohio, from June 2015 to June 2020. In June 2020, she lived in an apartment at Falcon's Pointe on Klotz Road, and she had roommates, but due to Covid, all of her roommates had moved out and gone home.

{¶ 15} M.B. met appellant in June 2015, the summer of her freshman year at BGSU, and they lived in the same dorm during the summer, as both played sports, and had to be at school early. At first she was friends with appellant, then they started talking

for about a year, dated for about a year and lived together for a while until they broke up in August 2019. After that, they were off and on talking, not talking, through June 2020. M.B. characterized her relationship with appellant as "pretty controlling," with good moments and really bad moments.

{¶ 16} On the afternoon of June 14, 2020, appellant was at M.B.'s apartment. He did not live with her and did not have a key to her apartment, but it was common for him to bring his laundry over and do it at her apartment. He was sitting at her desk eating leftovers from Red Lobster, where they had gone the night before for his birthday. She was laying in her bed looking at her phone, when appellant started talking about how M.B. didn't block people on social media who she had talked to when they were not together, or other guys in general. Appellant claimed she "didn't respect him" because she had not blocked these people, and he had done that for her. He was getting really agitated, although at first she did not think it was a serious conversation because they had never discussed this topic before. "[H]e ended up getting really angry * * * [and] [h]e started getting very mad and he kept talking * * * then * * * yelling and getting * * * just really fired up about this conversation." They then started to argue.

{¶ 17} M.B. was sitting on the edge of the bed facing appellant when he threw a cup of water in her face, "then he took the box of leftovers and threw that at [her] face as well * * * [and] got into [her] face and kind of, like, shook [her]." Then he knocked a shelf off of her wall, knocked the television down and "kind of, like disrupted [her] room." M.B. got up and went down the hall to get all of appellant's laundry, gave it to

6.

him and told him to leave and not come back. He grabbed the laundry, walked out of the door, and hit her with the door on his way out, hard enough that she fell into the hallway. He left and she locked the door. She was crying, had red marks and scratches around her neck, and a pretty deep bruise on her hip from where the door handle had hit her.

{¶ 18} M.B. took a short cell phone video of the aftermath of how she and her apartment looked, because her former work supervisor had been in an abusive relationship and said it was important to keep data or evidence. M.B. sent the video to her friend as appellant "had been talking about breaking my phone a lot, [and] I had a feeling that he was going to do something to my phone, so I wanted someone else to have it." After that, M.B. cleaned up her room, scrubbed the walls, tried to get the food out of the carpet, washed her sheets and took a shower. She did not report the abuse to the police because she did not think that would solve any problems, and it would make it worse.

{¶ 19} M.B. texted her brother to see if she could live with him because she felt like she was "in a lot of danger" since in the past, appellant could convince her his abuse was her fault, but "this time I knew it was not my fault because he got really upset over something we had never talked about before." She went to bed about 10 p.m. and silenced her phone. She was planning to move out of her apartment the next morning.

{¶ 20} Around or just after midnight on June 15, 2020, M.B. was woken up by knocking and banging on her bedroom window. Appellant had done this in the past when he would come over, as he did not have a cell phone, so they would contact each other by

7.

calling or texting through Facebook Messenger. She looked at her phone and saw that she had missed a call and messages from him. The first message said "aye, unlock the door, you still have some of my clothes here." The second message said "I see your car, fool." M.B. explained she did not park her car in her normal parking spot, she moved it behind her apartment complex so appellant could not see her car "if he really wasn't looking that hard. But he had to have driven around and looked for [her] car." She did this because appellant would watch her - he would drive through the neighboring apartment complex to check if she was home, and for a time, he would sit behind the dumpster and write down the times that she got home and left.

{¶ 21} M.B. spoke to appellant through her window, saying she gave him all of his clothes, she did not want him to come in and she was going to sleep. He kept saying he could not hear her because the window was closed, which she did on purpose because if she "would have opened it * * * he would have just came through the window." She told him she could hear him, just leave, but he said he was going to her door. They talked at the door for a second, then she let appellant into her apartment, as she "had been with him for a really long time, and * * * in my mind, he was coming into my apartment no matter what, it was just is he going to walk in calmly or is he going to break down my door and come in anyway." She figured "the safer option was to just let him in."

{¶ 22} After appellant came into her apartment, they talked but "it was like we were having two separate conversations. He wasn't really listening." She told him they could never be together because she did not feel like it was safe, she did not deserve to be

8.

treated like that, and it was not her fault that he did what he did. He kept bringing up how she did not block anyone and it was disrespectful, "[a]nd he was going through ways of getting really angry, really, really angry, then being calm, and just like, going up and down." At the end of the conversation, he asked her if they will ever get back together, and she said no. He stormed off and left. She locked her door and went back to sleep.

{¶ 23} Later, appellant again knocked on M.B.'s bedroom window which woke her up, she let him into her apartment and "[i]t was almost identical to the situation before" at the beginning, but "it started to become more violent and aggressive and, like, intense." He was talking about her disrespecting him, then he said "you aren't going to leave me, you are going to stay with me, and you're going to be loyal to me, and you're going to be my girlfriend." Then he "would get really, really angry" and say "you're going to be with me or you're going to be dead" and get in her face and yell. Next, he would act like he was joking and ask her calmly if she was going to be with him. M.B. did not know how to respond, she was confused and did not understand what was going on. M.B. wanted to be very clear and precise with her words because in the past, appellant "would use my words kind of against me if I wasn't 100 percent exact and clear in what I said." M.B. kept a notebook so she could go back and see what he said and what she said "[b]ecause he would do this so often."

{¶ 24} M.B. asked appellant to leave, but he did not leave. She told him if he would not leave, then she would because it was not safe for her. This had worked in the past when he would get really agitated and out of control. He would not let her leave,

9.

and "kept, like, picking [her] up, putting [her] back in [her] bed." Appellant had his first day back at work after Covid, on June 15, 2020, and said he had to go to bed, as he had "a meeting at, like 8:00 or something," so he needed to get some sleep. He told her "lay down, we're going to sleep." They were in her bed, she was against and facing the wall and he was on the outside, blocking her from leaving. He had her phone, her glasses and her purse with her keys in it in his pockets, then on the floor where she did not have access to them. M.B. was not very strong and weighed about 160 pounds, while she guessed appellant weighed around 230 pounds. She would try to sit up in bed and he push her back down.

{¶ 25} Appellant then started kissing M.B.'s neck and grabbing her breasts. She told him to stop, "it's really not the time for that. The only reason that I'm here is because you won't let me leave. I don't want to do that." He would stop but start again, and grabbed her "butt and stuff." She "specifically said -- because it was the whole thing of he would twist [her] words * * * if you continue to do this to me, this is sexual assault." He continued to do it, and she got angry and infuriated that he was touching her. The more agitated she got, the more aggressive he got. He grabbed her arm, and pulled it back; the more she would fight him, the harder he would grab her.

{¶ 26} Appellant "ended up, like pulling down [her] pants and so he, like, spit on his hand and put it on his penis, and then put it inside of [her] vagina, and then started to rape [her]." She said to him "I do not consent to this, * * * you're raping me." He stopped for a second, stood up and they got off of the bed. He then bent her over on the

10.

edge of her bed with both of her arms behind her back. She was not "super flexible" and could not really bend like that, but he pushed her down and she started yelling that he was raping her, then she tried to bargain with him, saying "[y]ou're not a rapist * * * [t]his is not what you do * * * you're better than this." He kept going and she was crying a lot and yelling so he put his hand over her mouth. She had her hair down and it was in her face and mouth, and with "snot and tears and stuff * * * it was choking" her, and her "face was down on the bed too." He eventually stopped and was looking at her, staring. She did not know if "he had, like, came inside [her] * * * but * * * when [she] stood up there was stuff dripping out in between [her] legs." She grabbed her glasses and phone, opened the window and got out; he did not stop her.

{¶ 27} M.B. ran, and was planning to go to the sand volleyball court to hide until appellant left, but she was not able to make it there. She looked back and saw appellant chasing her; he "caught" her. She told him "just take all my stuff * * * you can do whatever you want, just leave, like, I won't do anything about it. * * * Just leave me alone, just go." He grabbed onto her arm and told her to go inside, then he will leave. He "kind of pulled [her], walked with [her]." He took her phone. She thought if she went inside "something worse would happen to [her], or [she] would get killed. * * * So [she] felt like if [she] went back inside [she was] not going to live, [she was] going to die. So [she] didn't want to go back inside." She was yelling and appellant told her to be quiet, just go inside, that she was going to get him in trouble.

11.

{¶ 28} When they got to the middle of the parking lot, M.B. started panicking because she could not get away from appellant, because "he's got ahold of [her] arm. * * * So [she] * * * pretty much just made [her] whole body go, like, limp. So [she] just collapsed [her] body onto the ground." He grabbed her sweatshirt, dragging her on the concrete, so she "started screaming * * * help, help, help, a bunch of times." She thought people may be outside because at that point, it was morning, it was light. Appellant punched her in the side of the head and she blacked out for a couple of seconds. She heard her phone slam and crash, "it was a shattered sound." Appellant ran off, while M.B. was laying in the middle of the parking lot. She did not have her phone, so she was thinking someone would have heard her yelling and would come help her.

{¶ 29} After about 30 seconds, M.B. realized no one was coming to help her, so she got up and thought she needed to get to the clubhouse area where she thought there would be people, and she did not think appellant would follow her if someone was around, or they could help her. M.B. ran, trying to get to one of her best friends, Ryann's, house. M.B. crossed the street, and when she got to the end of the street, she turned back and saw appellant's car pulling out of her apartment complex. M.B. went to another apartment complex, tried to hide, as she did not feel good and her head hurt. She did not know what to do and did not know if appellant was following her, so she decided to "just keep running." She did not have her phone, car, car keys or shoes. M.B.'s former teammates lived on 3rd Street, so she went towards their houses, then saw Katie's

12.

house, and went to the door and started banging "for a very long time," hoping someone would answer, as M.B. knew she was not going to make it to Ryann's house.

{¶ 30} Katie opened the door, and M.B., who was sobbing said "CJ [appellant] raped me. I don't know what to do, can you help me get to Ryann's house, I need help." M.B. thought she would get sick, as she was nauseous, her head hurt and she was very tired. M.B. went to the bathroom, but did not get sick. M.B. asked to use Katie's phone. Katie listened to M.B., then they got in Katie's car and drove down the street to where Ryann lives. While on the main street, M.B. saw appellant driving towards her and Katie, coming from the direction of Ryann's house. M.B. ducked down in the seat so appellant would not see them and follow them. M.B. called Ryann, using Katie's phone, and asked Ryann what to do. Ryann advised M.B. to go to the hospital. M.B. asked Katie to drive to the hospital.

{¶ 31} At Wood County Hospital, M.B. called her parents on Katie's phone. Katie stayed with M.B. until M.B.'s parents drove up from Columbus and arrived at the hospital. A rape kit was performed, which "was pretty terrible" and "very invasive." M.B. was at the hospital for five or six hours. Some of M.B.'s belongings were collected for forensic purposes.

{¶ 32} M.B. testified she had consensual sex with appellant two or three days prior to June 15, 2020, but she did not consent to any sexual contact on June 15, 2020.

{¶ 33} After leaving the hospital, M.B. went with her parents to her apartment, and found her phone in the parking lot. The door to her apartment was locked, so M.B.

13.

climbed through the window to get inside. She took a shower, packed a bag and left for Columbus with her parents. M.B. moved in with her parents.

{¶ 34} A day or two later, the police called M.B.'s mother's phone and M.B. spoke with the police at that time. M.B. gave her phone, which was inoperable, to the police, and spoke to Detective AJ Cox of the Bowling Green Police Department.

{¶ 35} About one month later, M.B. called Detective Cox for a second time to ask him if another detective was supposed to be contacting her. M.B. had received a call from someone claiming to be a detective and asking her to answer questions about the case. Detective Cox confirmed the caller was not working with him, and told M.B. she was free to talk to anyone, but to be aware this person was not his coworker.

{¶ 36} Also about a month later, appellant was arrested. Before his arrest, M.B. testified "they couldn't find him. So that month of, like, not knowing where he is and if he's watching me * * * had a big impact."

{¶ 37} About three months later, M.B. "ended up having PTSD * * * flashbacks, didn't sleep for a while. It made it really hard to get a job."

{¶ 38} M.B. said she knew Anna, who also "talked to" appellant.[2] Anna contacted M.B. and did not encourage M.B. to cooperate with the investigation and law enforcement.

{¶ 39} On cross-examination, M.B. testified she graduated from BGSU in August 2019, and started her first job shortly after. Also in August 2019, appellant broke up with

---

[2]Anna and appellant had also been in an on-and-off again relationship.

14.

M.B., and she moved into an apartment at Falcon's Pointe. After a break of not talking to each other, she and appellant started chatting, off and on. In early June 2020, M.B. went with appellant to Florida for about four days. Shortly thereafter, M.B. went to her family's lake house. Her mother asked if she was still friends with or spoke with appellant, and M.B. said yes. This caused some problems because after the August 2019 breakup, M.B. gave her parents some insight of what the relationship with appellant was really like - it was an abusive relationship, so her parents were not happy she spoke to appellant or was friends with him. M.B. went through her mother's phone and found messages where her mother thought that M.B. speaking to appellant showed M.B. had low self-esteem, and her mother was disappointed that appellant had mistreated M.B. in the past and M.B. was allowing him to be around her again.

{¶ 40} On June 13, 2020, M.B. went with appellant to Red Lobster, then they went to her apartment but did not have sex. They had had sex a few days before, but not that night.

{¶ 41} M.B. testified that appellant had his own apartment and had a puppy. M.B. was asked if she had the dog at her apartment for a while, and she answered "[w]hen he was arrested previously the dog stayed with me." M.B. said the dog later went back to appellant's apartment.

{¶ 42} On redirect examination, M.B. discussed her parents' relationship with appellant before the August 2019 breakup, saying they liked him, he got along with her

15.

family pretty well, he had spent Christmas with her family, and her grandmother really liked him. Her family also went to appellant's athletic events.

{¶ 43} M.B. also stated that on June 15, 2020, she had her own apartment and appellant was facing eviction from his apartment.

### Sexual Assault Nurse Examiner ("SANE Nurse")

{¶ 44} Kirsten Rigley testified in June 2020, she was working at Wood County Hospital as an ER nurse and a SANE nurse. She explained the training required to be a SANE nurse, her responsibilities and the numerous steps involved in a SANE examination. The SANE exam is a very long process and extremely in-depth and invasive, and includes: history questions; physical exam; pelvic exam; pictures; the use of a Wood's light, which is like a blue light, to observe bodily fluids and the start of bruising not visible to the naked eye; and a rape kit or evidence collection kit. All of this information is recorded in a SANE report. At the time of trial, she had conducted 16 SANE examinations.

{¶ 45} Rigley generated a SANE report for M.B. on June 15, 2020, which related that: M.B. was admitted to the hospital at 5:59 a.m.; the assault occurred at approximately 4:30 to 5:30 a.m. on June 15, 2020; the assailant was identified as appellant, M.B.'s ex-boyfriend; there was vaginal penetration by the assailant, saliva was used as a lubricant and he ejaculated in M.B.'s vagina; a moderate amount of white drainage was noted near the cervix; there was a bruise and scratches on her right thigh; M.B. did not change clothes, use the bathroom, vomit, brush teeth, eat or shower since the incident; M.B.'s

16.

underwear was collected with moderate discharge present; and there was consensual sexual activity within 96 hours. The report also included an eight-page narrative of what happened.

{¶ 46} Rigley opined that in her experience as a SANE nurse and as a woman, "it would be uncommon to find this amount of discharge or drainage" from sexual conduct which occurred two to four days earlier.

{¶ 47} On cross-examination, Rigley agreed that the crime lab analyzes the evidence collected in sexual assault cases. Rigley acknowledged no bleeding, cut, rips or tears of M.B.'s vagina were noted in her documentation, and no injuries were found in or around M.B.'s mouth or her nose, neck, wrists, arms, feet, back of her legs or behind her ears.

{¶ 48} On redirect examination, Rigley testified that of the 16 SANE examinations she has conducted, there was only visible vaginal trauma in 2 or 3.

**Emily Feldenkris**

{¶ 49} Feldenkris testified she is a forensic scientist in the DNA section at the Ohio Bureau of Criminal Investigation ("BCI"). The court recognized her as an expert witness regarding forensic DNA analysis. Feldenkris testified she performed DNA testing involving M.B. and appellant, and generated a report regarding the items tested and her findings. Feldenkris analyzed the vaginal swabs and anal/perianal swabs in the rape kit from M.B., and the results indicated a mixture of DNA profiles from M.B. and

17.

appellant, with acid phosphatase, which is found in high concentrations in semen and much lower concentrations in vaginal secretions, saliva, some bacteria and some plants.

{¶ 50} Feldenkris also analyzed the underwear in M.B.'s rape kit, and the results indicated a mixture of DNA profiles from M.B. and appellant "[a]nd the profile that was consistent with his profile was consistent with the sperm fraction of that sample." Feldenkris analyzed the swab from M.B.'s right cheek and found a mixture of DNA profiles from M.B. and appellant, with no acid phosphatase.

### Doryan Caver and Sharon Kline

{¶ 51} Ms. Caver testified she was a BGSU student and had lived in an apartment at the Hillsdale Apartment complex ("Hillsdale"). Although her lease ran through June 22, 2020, she moved out all of her belongings and left her apartment by April 3, 2020. She sublet her apartment to appellant, whose name was on a list that she had received from Mecca. Outside of the sublease agreement, Caver did not know appellant.

{¶ 52} Ms. Kline testified she was employed as a property manager by Mecca Management ("Mecca"), and Hillsdale is one of the rental properties that Mecca manages. She identified the sublease contract between Caver and appellant for the unfurnished apartment, which ran from April 3, 2020 to June 22, 2020. Caver discussed the inspection of the apartment which she conducted on June 22, 2020, and documented all of the items left behind, which included a sectional couch, mattresses and clothes.

{¶ 53} Kline testified dogs were not permitted at Hillsdale, but that "[w]e did see a dog there [at appellant's apartment] at some point, and there's also been reports with

18.

incidents with a dog there was well." A material rule violation notice was issued to appellant. Also, a three-day notice to evict was posted on appellant's apartment door, directing him to pay or move out of the apartment by June 1, 2020. A second notice to evict was issued to appellant, to pay or move out of the apartment by June 16, 2020. No official eviction was ever filed, as the lease was set to end on June 22, 2020. Kline did not know when appellant vacated the apartment, but she knows it was not by June 1, 2020. Appellant did not return the apartment key to Mecca.

### Detective AJ Cox

{¶ 54} Detective Cox testified that on June 15, 2020, there was a notification from Wood County Hospital that a SANE examination had occurred. A police report was generated and an investigation was undertaken. Detective Cox reviewed the SANE report and tried to contact M.B., however he was not able to immediately speak with her. He also attempted to locate appellant, but between June 15, 2020 and the middle of July 2020, the detective did not know appellant's whereabouts.

{¶ 55} On June 18, 2020, Detective Cox interviewed M.B. at the police station, took pictures of her and was given her damaged phone, then escorted her and her parents to M.B.'s apartment to gather some belongings. Since appellant had not been located, M.B. and her parents were fearful for their safety. At M.B.'s apartment, the detective collected the sheets and bedding from the bedroom. BCI did not test these items, as it is BCI's standard policy that if DNA is recovered from the SANE kit, other items are not tested. Detective Cox also obtained surveillance footage from Falcon Pointe, of the area

19.

by the clubhouse, where M.B. was seen running, and about a minute later, a car was observed. Based on the information he had, the decision was made to issue a warrant for appellant for rape.

{¶ 56} Appellant was arrested in Florida on July 9, 2020, and was brought back to Ohio where he was interviewed by Detective Cox on July 21, 2020. The recorded interview was played for the jury. The detective testified appellant said the following during the interview: he (appellant) knew there was a warrant, and became aware of it on June 21, 2020, then later said June 18, 2020; he was restrained and had to jump out of the window to try to get away from M.B.; no sexual conduct occurred on June 15, 2020; he knew or heard rumors about DNA results; he went to work on Monday, Tuesday and Wednesday and left for Florida on Thursday, June 18; M.B. charged him and attempted to punch him, during which her phone fell to the ground and was damaged; and he repeatedly said he would have his phone mailed to the police.

{¶ 57} Det. Cox testified he observed the size difference between appellant and M.B., as appellant was about 6'2" and 215 pounds. The detective noted appellant's DNA had not yet been collected at the time of the interview. The detective observed M.B. willingly provided her phone to the police, but it was so smashed and damaged it could not be examined. The phone had a hard, clear plastic case, and the front of the phone had no damage, but the back was broken. Detective Cox opined the damage to the cell phone was consistent with it being deliberately destroyed. Appellant never mailed his phone to the police so it could be examined.

20.

{¶ 58} Detective Cox reviewed recorded phone calls from the jail between appellant and Anna, including a July 25, 2020 call, where the detective learned that Anna had appellant's phone in Bowling Green. Detective Cox applied for a search warrant for Anna's apartment, executed the warrant and collected appellant's phone on August 4, 2020. The phone was downloaded and there was "not nearly the amount of data or messages or photos or anything on a phone that you would expect to be on a phone." A search warrant was also issued to Facebook for appellant's account and although about 1800 pages were received, there were only three messages between appellant and M.B. A Facebook document showed that on June 15, 2020, the locations of appellant's Facebook account were either deleted or off. At trial, a recorded jail call between appellant and Anna was played for the jury.

{¶ 59} On cross-examination, Detective Cox acknowledged that in his report, it stated M.B. was fighting and screaming during the encounter on June 15, 2020. The detective testified he spoke with a few of M.B.'s neighbors, but did not find any witnesses who heard anything. Detective Cox agreed M.B. had indicated she left her phone in the parking lot when she ran to Katie's house, so the phone was in the lot from about 4:30 a.m. or 5:30 a.m. to noon, and it was possible, but not likely, that the phone was run over by a car. The detective did not go to M.B.'s cell phone provider and download data, nor did he subpoena her Facebook or Snapchat accounts. During the interview, appellant denied all of the charges.

21.

{¶ 60} On redirect examination, the detective testified M.B. never denied having consensual sex with appellant on June 12, 2020. Det. Cox also observed that it was not disputed that Detective Cox said he was given two explanations for how M.B.'s phone was damaged: appellant said M.B. charged him and tried to strike him with the phone but the phone fell out of her hand and hit the pavement; and M.B. said appellant spiked her phone into the pavement. Regarding not subpoenaing M.B.'s Facebook account, the detective was asked which party alleged they had items of evidentiary significance on Facebook Messenger, he answered appellant.

**Appellant**

{¶ 61} Appellant testified to the following. He attended BGSU, graduated, and started a job in March 2020, right around the time that Covid hit. His job involved going out to stores to "accumulate clientele" and help consumers get the best rate for their utility bills. Due to the pandemic, he was not able to go in the stores and interact.

{¶ 62} Eventually, appellant sublet an apartment through June 22, 2020, and had a dog, although he was not allowed to have pets there. He received evictions notices, but did not leave because he did not have anywhere else to go, and he "was under the impression that * * * since COVID had happened, that we were going to be * * * excused or something from * * * paying rent, and it would be like, delayed, and we would have to just owe the company when we got back to our jobs fully."

{¶ 63} Appellant met M.B. in June 2015, at a dorm at BGSU, and they dated for almost three years. They lived together for a while until August 2019, when he broke up

with her because she was always accusing him of cheating on her and she did not "like the friends [he] kept." M.B. moved to Falcon's Pointe, and he eventually reached out to her. He described their relationship at that point as "[w]e were not exclusive. We were just hanging out, friends, and we would occasionally see each other." On June 6 or 7, 2020, he went to Florida with M.B., visited his friends and family, and they returned to Bowling Green on June 9, 2020.

{¶ 64} On the evening of June 13, 2020, appellant and M.B. went out to dinner, then went back to M.B.'s apartment where they watched Netflix, he played a video game and "me and [M.B.] had consensual sex." He spent the night at M.B.'s apartment, and got up at 12:30 or 1:00 the next day, watched tv and did laundry at her apartment. Later, he was sitting at a desk eating his leftovers and looking at his phone when he noticed M.B. was looking over his shoulder at his phone. He asked why she was looking. He said, "I kind of chuckled when I did, you know, jokingly. And then she denied it and then I said I caught you, though. And then I continued, like, laughing. And then she got angry. * * * So I kind of called her out on a double standard because, I don't do it to you, so why are you doing it to me." M.B. "started throwing water" at him, then "she started to try to punch" him. He was kind of laughing it off, and trying to stiff-arm her from hitting him in the face. He further stated, "Well, as I said, when me and her were in the room and she was trying to hit me in the face and I was straining -- well, stiff-arming her away from me, she -- we were turning around and she turned -- she threw water at me and then she -- well, she was trying to punch me in the face as well, but my butt was

actually bumping against her desk and that's where -- in the photo you see all [of] my shrimp on the ground." He said she then threw mashed potatoes at him and he "dodged them" and they got on the wall.

{¶ 65} Appellant was asked how items were knocked off of her shelves and the tv was knocked over, he replied, "I did not knock the TV over because that is the TV that I used to play video games when I was at her apartment. Also I paid for that TV, so it would make no sense for me to knock it over. As far as her plants getting knocked over from the shelf that is -- I do not know how that got knocked over." After this, he got his laundry, walked to her door and while holding the laundry basket, he pulled the door open "and since my hands were full already I kind of kicked the door open, and I'm guessing that's when the doorknob struck [M.B.] on her leg." He left, but said she was upset that he was leaving. He denied assaulting or attempting to harm M.B.

{¶ 66} Appellant went back to his apartment to check on his dog, who was three months old at the time and about 45 pounds. The dog was "[n]ot really" well-trained and "jumped up on everybody." After appellant was at his apartment for a couple of hours, he "felt like the tension had kind of, like, ceased a little bit and she had calmed down a little bit" so he returned to M.B.'s apartment. Since his cell phone did not have service and he could not send text messages, he knocked on M.B.'s window. Appellant spoke to M.B. at the window, then asked if he could talk to her "through the threshold of the door" and she said yes. Appellant testified that "[w]e started talking through the threshold of the door, and that's when she really welcomed me into her house, well, asked me to come

24.

inside [of] her house because she didn't want her neighbors to overhear our conversation in the hallway." He said they were in the kitchen and he told M.B. he was sorry for laughing at her and she said she was sorry for trying to hit him. For about an hour and a half, maybe two hours, he said it was "just small talk, basically about how much more laundry I had and what I was going to do for my birthday." He left and "went back to [his] apartment, checked on [his] dog and hung out with [the dog] for a little bit. And then [he] came back to [M.B.'s] apartment."

{¶ 67} Appellant knocked on M.B.'s window. He explained that this was "because she told me she was going to leave her door unlocked, which is why * * * when they presented the message from Messenger she's -- I said, hey, open the door, unlock the door, fool." He said she invited him inside, and "[w]hen I got into [M.B.'s] house the third time we were -- I checked my laundry. We were basically just hanging out. And then I was playing video games. And we were talking again. And I was laying on her bed. We were both laying on her bed and we were just hanging out really, laying down, not doing much." He said their cell phones were on the floor when M.B.'s phone vibrated and he looked and it was "someone that she told me that she didn't talk to anymore. Because that's why we essentially went to Florida before, because we were both trying to be -- we were trying to work on our relationship. * * * And I see that -- I saw that she had a notification from him, so I was just like, why did you -- pretty much why did you -- why do you call me out on everything and why did you even go to Florida with me if you are still talking to this person? Why didn't you just be honest? I mean,

25.

it's not like we're actually dating." He said "[s]he then got upset and started saying, well -- she started bringing up stuff that she thought that I was doing." He told her he "no longer wanted to deal with her at all, I then tried to leave her apartment. * * * I got up and walked towards the threshold, and she kind of, like, put her whole body in the whole door and said, no, wait, we can talk about this, you don't have to do this, we don't have to end everything all because someone messaged me."

{¶ 68} After M.B. blocked the door, appellant said, "I then went to her window, pulled the blinds, opened -- slid the window up and popped out her screen for the window and exited out [of] the window. * * * I walked over to my car * * * I sat in my car. That's when [M.B.] followed me out of the window and stood in front of my car and said, why -- you're not leaving, you don't need to leave, we're talking about this, you're overacting." He said he got out of his car and walked around her building to the middle parking lot, she followed him and "was kind of hysterical * * * crying * * * telling me how she hated me and how her family hated her, and how she pretty much chose me over her family. And I -- and now I'm leaving her." He said he "was kind of getting frustrated" and said he did not want to talk to her, she was wasting both of their time and he no longer wanted to interact with her in the future. Then, "she tried to -- she tried to basically hit [him] with -- she tried to swing on [him] with her phone in her hand and she struck down – like, struck down trying to hit [him], and [he] blocked her arms, and her phone fell out of her hand." He said he walked away from M.B., through her building

26.

and went back to his car.  He denied smashing M.B.'s phone, punching her or dragging her.  He said he drove out of her neighborhood to his apartment

{¶ 69} After appellant returned to his apartment, he slept then got up and went to work. He worked Monday through Thursday, and left on Thursday for Florida because "that is where [he is] from.  That is where all [of his] family is, and that's where [his] friends are."  He was asked when he was planning to return to Ohio, and responded, "[w]ell, my grandmother had actually contacted me and she informed me that she wasn't feeling well, and with the pandemic going around I was not going to risk not being there to help her and aid her.  So I went there and -- I didn't think that she was going to be sick for very long, so I just went there for -- planning for a couple [of] days, but I did not -- that obviously did not happen."

{¶ 70} Appellant testified he deleted the history on his phone with M.B. because he had nothing else to say to her, he blocked her on social media and blocked her phone number.  He said his location history was never on on his phone.  He denied raping or kidnapping M.B., or destroying her phone.

{¶ 71} On cross-examination, appellant was asked why, during the police interview, he never mentioned M.B. threw food at him on June 14, 2020, and he replied, "[b]ecause that was already, -- I mean, I just -- I guess I was in such a panic that I was in jail for something that I did not do that I guess it just never came into my mind.  I just wanted to get to the meat of the situation, the most important parts that I thought were significant to what was going on in the situation."  The prosecutor inquired why talking

27.

about going to Florida a week prior was significant, but food being thrown the day of was not, and appellant responded, "I thought -- I thought that talking about Florida was significant because it would show that recently she just drove out of state with me to our -- which would take about 15 hours, without telling anybody from her family that she drove out of state with me. So she took the longest route possible somewhere with me, so I thought that was -- I mean, that would help me."

{¶ 72} Appellant was questioned about the last time he had consensual sex with M.B., he answered, "if we're being technical, we started to engage in sexual activity on the 13th, which would be two days. And we ended up into the morning of the 14th."

{¶ 73} Appellant was asked if he went to Florida because his grandmother was ill or he was being evicted, and he said it was because his grandmother was ill, and "[t]he plan was to stay in Florida for three days until my friends that I said went to Texas, until they returned back to Bowling Green and I would usually crash with them, and basically find a storage to put my stuff in and find a new place and stuff." He was asked about a three-day trip to Florida turning into a three or four-week trip that "coincidentally coincided" with him learning he had an arrest warrant, and appellant answered, "[y]eah. Pandemic is going on and people are losing their family and friends to this sickness." The prosecutor noted that in the police interview, appellant said he went to Florida because he was being evicted. Appellant responded, "I was being evicted. * * * I was at the time just mostly concerned with the health of my grandmother."

28.

{¶ 74} Regarding when he learned about the warrant for his arrest, appellant stated, "I did not learn -- I did not learn from a law enforcement officer that I had warrants out for my arrest until the day that I was arrested, July 9th, by the US marshal at gunpoint. * * * I did not officially know that I had a warrant out for my arrest until the US marshal informed me the day that they arrested me on July 9th. * * * As I stated in my interview with the detective, there was rumors about stuff that was going on, but I brushed them off because I know what I had done at that point and it was not rape anybody, so I really was very unconcerned about what was being rumored around me. * * * Officially I became aware of the warrants and their -- their credibility on July 9th when I got arrested by the US marshals." The prosecutor asked if, in his police interview, appellant stated: "'On Sunday my attorney told me I had warrants for rape, kidnapping -- 'you said battery, but I think you mean burglary --' and disrupting public services.'" Appellant explained, "[my attorney] told me there may be. He never officially said, oh, you definitely had these warrants. He said, there may be, I have to look into it, which is why I said that. * * * It wasn't official. He told me that he had to look into it, but I told him that there was -- there would have been, you know -- he would have guessed or he heard or he hasn't officially found this out yet."

{¶ 75} Appellant was questioned, concerning the material rule violation he received for having a dog at his apartment, whether that prompted him to leave, and he responded, "[t]hat is not an official eviction. It means pay or leave. * * * I didn't pay because my payments from work were significantly lower, but if I were to wait I'd be

able to pay the full amount on the bill." When asked whether the three-day notice was an official eviction notice, appellant said, "[n]o, that it is not an official eviction notice. That is a three-day notice." The prosecutor then asked, "[s]o are you indicating that you never received an official eviction notice?" Appellant replied, "[w]ell, the following Monday would be the 22nd of June, which is when I was supposed to -- when my lease would end. So no, I didn't receive an official." The prosecutor referenced appellant's statement in his police interview that he went to Florida because of the eviction notice, and appellant replied, "[w]ell, I did have an eviction notice that was official that was something that was real. That was -- they put on my door if I do not pay this money I have to leave. And my -- my lease was up on the 22nd, so -- yeah." Appellant acknowledged he went to Florida with M.B. after he received the first eviction notice, on June 1, 2020. When asked if he took a lot of items with him to leave in Florida, he said he did not because he was not planning on staying very long.

{¶ 76} Appellant was questioned about his statement in the police interview, that he went back to M.B.'s apartment to get his laundry after she ran off, and he answered, "I did not go back to get any laundry, as it is pretty clear that her -- wasn't her door locked? Didn't she say that?" The prosecutor presented the statement appellant gave to police: "'So she ran off. She ran off. And that's when I left, like a couple minutes later. And I was like, oh shit, I forgot my laundry. So I came back to her house, get my laundry, then I leave to go to work.'" Appellant said he was confused and mistaken because he had

gone back to M.B.'s apartment so many times to get laundry, but he did not return to her apartment.

{¶ 77} On redirect examination, when appellant was asked about why M.B. was acting so upset when he said he was going to break up with her, he responded, "[b]ecause early -- the week prior she had gone to her family's lake house and told her mother that me and her were back together, and her mother disagreed with that. And her mother then went on to have a conversation through text with her father, and they discussed their disagreement with her talking to me, and they also discussed how she would have nowhere to go when her lease was up."

{¶ 78} As to the trip to Florida, appellant explained, "I left to go down to Florida to * * * aid my grandmother's health. Also, I didn't really have -- as we stated before, I was being told that I really couldn't be there anymore, and none of my friends were in town in Bowling Green so I couldn't go crash at one of their houses, so I would be essentially without a place to stay for those couple [of ] days until they returned."

{¶ 79} On recross-examination, appellant was questioned about M.B.'s relationship with her parents, and that she hid her trip to Florida with him but then willingly told her parents she was back together with him, he replied, "[t]he relationship with her parents had been salvaged because she was talking to me again after I broke up with her." He then acknowledged that M.B.'s parents did not like her being with him, they were not going to let her live with them in Columbus when her lease was up, and her

31.

family was "excommunicating her because they disagreed with the company that she kept."

{¶ 80} For ease of discussion, we will examine appellant's assignments out of order.

## Second Assignment of Error

{¶ 81} Appellant contends the trial court erred by denying his motion for a mistrial after the prosecutor referred to M.B. as a "victim." Appellant observes he filed a motion in limine before trial to address the issue, the court ordered that the prosecutor not call M.B. a victim, and the prosecutor violated that order. Appellant asserts the prosecutor's statement was inflammatory, prejudicial and inappropriate as it served to bolster M.B.'s credibility in the eyes of the jury. Appellant further submits his constitutional right to a fair trial was affected by the prosecutor's misconduct in making the statement.

## Law

{¶ 82} "The decision to grant or deny a motion for a mistrial is left to the sound discretion of the trial court." *State v. Morales*, 6th Dist. Lucas No. L-07-1231, 2008-Ohio-4619, ¶ 30. Abuse of discretion means the trial court's decision was unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 83} The test for prosecutorial misconduct is whether the prosecutor's statement was improper, and if so, whether the statement prejudicially affected the substantial rights of the accused. *State v. Lott*, 51 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990). When

32.

reviewing an allegation of prosecutorial misconduct, the challenged statement must be viewed in the context of the entire trial. *State v. Maurer*, 15 Ohio St.3d 239, 266, 473 N.E.2d 768 (1984); *Darden v. Wainwright*, 477 U.S. 168, 181-182, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). An improper statement by the prosecutor does not affect a substantial right of the accused if it is clear, beyond a reasonable doubt, that the defendant would have been found guilty even without the improper statement. *State v. Treesh*, 90 Ohio St.3d 460, 464, 739 N.E.2d 749 (2001).

**Analysis**

{¶ 84} Upon review, on the last day of the trial, the prosecutor referred to M.B. as a victim one time, then immediately used M.B.'s name. Appellant's counsel objected and a sidebar was held where the prosecutor explained it was not intentional or deliberate that he used the word "victim," and he remedied and corrected it. Appellant's counsel requested a mistrial, which the court denied. The court noted it did not even hear the reference.

{¶ 85} We find the prosecutor's use of the word victim to refer to M.B. was improper, due to the trial court's order that M.B. could not be called a victim. However, considering the entire record and the context of the prosecutor's statement, we find the statement did not prejudicially affect appellant's substantial rights, as it is clear, beyond a reasonable doubt, that the jury would have found appellant guilty even without the improper statement. We further find the trial court's decision denying appellant's request

33.

for a mistrial was not unreasonable, arbitrary or unconscionable. Accordingly, appellant's second assignment of error is not well-taken.

## Third Assignment of Error

{¶ 86} Appellant argues the trial court abused its discretion by allowing the state to introduce evidence of a third party (Anna) who threatened M.B. Appellant contends M.B. testified during the state's case in chief that she was contacted by Anna and encouraged not to cooperate in the investigation against appellant. Appellant objected to the testimony on relevancy grounds, but the objection was overruled.

{¶ 87} Appellant submits "the introduction of what amounted to be a threat made toward M.B. by [Anna] cast [appellant] in a prejudicial light and allowed the jury to infer that Appellant had prompted [Anna] to call M.B." He asserts the "testimony on this threat was introduced to demonstrate consciousness of guilt by Appellant, prompting [Anna] to intercede on his behalf at his direction." Appellant maintains the state "did not introduce any evidence that Appellant had requested [Anna] to threaten M.B. or was connected to [Anna's] actions in any way." He claims the evidence was not admissible under Evid.R. 402, as to relevance, and the probative value of the evidence was substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury under Evid.R. 403(A).

{¶ 88} The state counters the victim never testified that she felt threatened by Anna, and it was never claimed that Anna had threatened the victim. Rather, the state observes it was argued by appellant's counsel that appellant's sister had threatened the

34.

victim, and the court sustained appellant's objection regarding the actions of appellant's sister. The state contends the victim testified about receiving multiple phone calls from a man pretending to be a police detective, who wanted to talk about the case. The state submits this coincided with the victim testifying that Anna called and encouraged the victim not to cooperate with law enforcement or the investigation. The state claims the victim's testimony "holistically speaking, was to contextualize why [the victim] spoke with Detective Cox again."

{¶ 89} The state argues, per appellant's request, the jury heard the phone call between appellant and Anna, so the jury "could draw its own conclusions as to her [Anna's] intentions of working with [appellant] to thwart the ongoing police efforts to solve [appellant's] case." The state maintains that Anna not encouraging the victim to cooperate with the investigation of appellant "is not an 'if you testify, bad things will happen to you' injunction." The state submits the victim "never testified that she felt threatened not to testify after her conversation with [Anna]." The state further asserts appellant was not materially prejudiced by the question posed to the victim, "near the end of her far more compelling testimony related to [appellant's] attack where he kidnapped and raped her."

### Law

{¶ 90} Pursuant to Evid.R. 402, all relevant evidence is generally admissible at trial. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less

35.

probable than it would be without the evidence." Evid.R. 401. However, the introduction of relevant evidence is limited by Evid.R. 403(A), which prohibits the introduction of evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

{¶ 91} Threats against a witness by a person other than the accused may be admissible against the accused under certain circumstances, like evidence of consciousness of guilt if it is shown the accused was connected to the threats. *See State v. Walker*, 55 Ohio St.2d 208, 215, 378 N.E.2d 1049 (1978); *State v. Smith*, 49 Ohio St.3d 137, 143, 551 N.E.2d 190 (1990); *State v. Baldwin*, 6th Dist. Wood No. WD-18-064, 2021-Ohio-84, ¶ 45.

{¶ 92} A trial court's decision to admit evidence will not be reversed on appeal absent a finding of abuse of discretion. *Rigby v. Lake Cnty.*, 58 Ohio St.3d 269, 271, 569 N.E.2d 1056 (1991). An abuse of discretion means the trial court's decision was unreasonable, arbitrary or unconscionable. *Blakemore*, 5 Ohio St.3d at 219, 450 N.E.2d 1140. "A decision is unreasonable if there is no sound reasoning process that would support that decision." *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

36.

**Analysis**

{¶ 93} Appellant challenges the following direct testimony of the victim (hereinafter "challenged testimony"):

Q. I'm curious about an individual, and if you can identify how you know an individual named Anna * * *?

A. So she was a girl that also talked to [appellant] at the same time I did. So I knew her through him.

Q. Okay. And sometime after June 15th she contacted you?

A. Yes. She did contact me and said that -

[Defense counsel]: Your Honor, I'm going to object * * * I would argue that it's not relevant. * * * [I]t's a third party. [Appellant] never directed [Anna] to have any contact with anybody, so it's not relevant to the issues at hand.

* * *

The Court: Objection overruled.

Q. * * * Did Anna * * * encourage you to cooperate with the investigation and law enforcement?

A. No.

{¶ 94} Upon review, the challenged testimony does not contain an obvious threat, and there is no indication that M.B. was afraid of appellant, Anna, or cooperating with the investigation or law enforcement as a result of being contacted by Anna. The state

37.

offered the challenged testimony to show the effect on M.B., and to put into context why she reached out to the detective again.

{¶ 95} While the relevancy of the challenged testimony may be debatable, we fail to see any unfair prejudice which resulted from its introduction, despite appellant's claim that the testimony amounted to a threat, and was presented to demonstrate his consciousness of guilt and to cast him in a prejudicial light. We find the probative value of the challenged testimony was not substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury. Thus, we find the trial court did not abuse its discretion by allowing the admission of the challenged testimony. Accordingly, appellant's third assignment of error is not well-taken.

## Fourth Assignment of Error

{¶ 96} This assigned error again concerns the challenged testimony. Appellant argues his trial counsel was ineffective and his rights under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, §10 of the Ohio Constitution were violated due to his counsel's failure to move for a mistrial after the court overruled the objection regarding the challenged testimony.

## Law

{¶ 97} To prevail on a claim of ineffective assistance of counsel, an appellant must prove trial counsel's performance was deficient, because it fell below an objective standard of reasonable representation, and but for counsel's errors, there is a reasonable probability the outcome of the trial would have been different. *State v. Lewis*, 6th Dist.

38.

Lucas No. L-18-1069, 2019-Ohio-3929, ¶ 35, citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**Analysis**

{¶ 98} In light of our finding that the trial court did not abuse its discretion by admitting the challenged testimony, we find appellant has not shown his trial counsel's failure to move for a mistrial after the court allowed the challenged testimony was deficient, that appellant was prejudiced, or that outcome of the criminal proceeds would have clearly been different. Accordingly, appellant's fourth assignment of error is not well-taken.

**Fifth and Sixth Assignments of Error**

{¶ 99} Appellant asserts the trial court erred by denying his Crim.R. 29 motion, as the state produced insufficient and unsupported evidence on each charge. Appellant also claims the jury's verdict was against the manifest weight of the evidence. Appellant challenges the credibility of the evidence presented against him, and argues the state did not meet its burden of persuasion. Appellant asserts "the jury did not fully consider the evidence or, more specifically, lack thereof in this matter, prior to convicting [him]." Appellant also contends the jury focused on the serious nature of the charges and sympathy for M.B., and totally discounted his testimony.

{¶ 100} Regarding the rape charge, appellant "denied having sexual contact with M.B. on June 15, 202[0], and M.B. testified * * * that they had consensual sex just prior to June 15th." He submits the state's DNA expert "testified DNA can be preserved in a

39.

vagina over a period of 72-96 hours." Appellant argues the SANE nurse testified she did not observe any injury to M.B.'s vaginal area, and no injuries were found on M.B.'s wrists, neck or throat, despite her claims that she was punched, choked and dragged by him. Appellant maintains there is no forensic evidence, physical evidence or unbiased witness testimony to support this charge.

{¶ 101} With respect to the kidnapping charges, appellant claims the state offered no credible evidence that he restrained M.B.'s liberty in any manner, there was no physical evidence, and the only evidence introduced was M.B.'s unsupported testimony. He argues no witnesses testified that they heard M.B. yelling or screaming for help.

{¶ 102} Regarding disrupting public services, appellant contends no forensic testing was conducted on M.B.'s damaged cell phone, thus there is no forensic evidence that he destroyed or disabled her phone.

### Standards

### Crim.R. 29 - Sufficiency of the Evidence

{¶ 103} Crim.R. 29(A) provides:

The court on motion of a defendant * * * after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment * * * if the evidence is insufficient to sustain a conviction of such offense or offenses.

{¶ 104} Sufficiency of the evidence is a legal standard that tests whether the evidence introduced at trial is legally adequate to support a jury verdict as to all elements

40.

of the crime. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). The proper analysis under a sufficiency of the evidence standard is "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Williams*, 74 Ohio St.3d 569, 576, 660 N.E.2d 724 (1996), quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

**Manifest Weight of the Evidence**

{¶ 105} We review a claim that a verdict is against the manifest weight of the evidence by weighing the evidence and all reasonable inferences, considering the credibility of the witnesses, and determining whether the jury lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387. "[A] reviewing court asks whose evidence is more persuasive - the state's or the defendant's?" *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25. We do not consider the evidence in a light most favorable to the state, rather "we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson*, 6th Dist. Lucas No. L-10-1369, 2012-Ohio-6068, ¶ 15, quoting *Thompkins* at 387.

{¶ 106} While we consider the credibility of witnesses under a manifest-weight standard, we extend special deference to the jury's credibility determinations, as the jury has the benefit of observing the witnesses testify, viewing their facial expressions and

41.

body language, hearing their voices, and discerning traits like sincerity, equivocation and uncertainty. *State v. Dean*, 2018-Ohio-1740, 112 N.E.3d 32 (6th Dist.), ¶ 39. The jury may believe or refuse to believe all, part, or none of a witness's testimony. *Id.*, citing *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964).

### Analysis

### Rape

{¶ 107} R.C. 2907.02(A)(2) provides that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."

{¶ 108} In *State v. Hartman*, 6th Dist. Sandusky No. S-19-036, 2020-Ohio-4245, ¶ 39, we noted "[t]he report indicated no injury or trauma * * * [but] injury, trauma * * * is not an element of the offense of rape."

{¶ 109} Here, the state called Katie, M.B., the SANE nurse, a forensic scientist and Detective Cox to testify about the events which occurred on June 15, 2020. The state also introduced videos, a scientific report, the SANE report, photographs and drawings. Construing this evidence in favor of the state, we find there was sufficient evidence in the record to support each element of rape.

{¶ 110} As to the manifest weight of the evidence, considering the testimony and exhibits presented at trial, we find this evidence allowed the jury to infer and conclude that appellant purposely compelled M.B. to submit to sexual conduct by force. Further, we cannot find the jury clearly lost its way, by believing the state's evidence over

42.

appellant's testimony, and created such a manifest miscarriage of justice that appellant's rape conviction must be reversed and a new trial ordered.

## Kidnapping

{¶ 111} R.C. 2905.01(A)(4) provides:

(A) No person, by force, threat, or deception * * * shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:

* * *

To engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will * * *.

R.C. 2941.147(A) states:

(A) Whenever a person is charged with an offense that is a violation of section * * * 2905.01 of the Revised Code * * * the indictment * * * charging the offense may include a specification that the person committed the offense with a sexual motivation.

{¶ 112} In *State v. Griffin*, 10th Dist. Franklin No. 10AP-902, 2011-Ohio-4250, ¶ 87, the court found testimony that the offender positioned himself between the victim and the door, thereby preventing the victim from leaving, was sufficient to sustain a kidnapping conviction. The court in *State v. Powell*, 8th Dist. Cuyahoga No. 99386, 2014-Ohio-2048, ¶ 16, held the act alone of the offender putting his arm out to prevent

43.

the victim from leaving the house constituted a restraint for purposes of the kidnapping statute.

{¶ 113} Here, at trial, the jury heard testimony from M.B. detailing how appellant deliberately prevented her from leaving the apartment, how he purposely pushed her down when she tried to sit up in bed and how he blocked her in the bed with the position of his body, thereby restraining her liberty in order to have sex with her. Viewing this evidence in the light most favorable to the state, we find there was sufficient evidence in the record to support each element of kidnapping.

{¶ 114} Regarding the manifest weight of the evidence, considering the record, which mainly consists of the conflicting testimony of M.B. and appellant, we find the evidence allowed the jury to deduce and decide that appellant restrained M.B.'s liberty, by force, to engage in sexual conduct. Although no witnesses testified they heard M.B. yelling or screaming for help, and scant physical evidence was offered other than the video of M.B. running across the apartment complex parking lot, we defer to the jury as to the weight to be given to the evidence that was presented and the credibility of the witnesses. Thus, we cannot find the jury clearly lost its way and created such a manifest miscarriage of justice so appellant's kidnapping conviction must be reversed and a new trial ordered.

44.

## Disrupting Public Services

{¶ 115} R.C. 2909.04(A)(3) states:

No person, purposely by any means or knowingly by damaging or

tampering with any property, shall * * *

Substantially impair the ability of law enforcement officers, firefighters,

rescue personnel, emergency medical services personnel, or emergency

facility personnel to respond to an emergency or to protect and preserve any

person or property from serious physical harm.

{¶ 116} Regarding disrupting public services, in *State v. Robinson*, 124 Ohio St.3d 76, 2009-Ohio-5937, 919 N.E.2d 190, syllabus, the Supreme Court of Ohio ruled:

The damaging of a single private telephone or cellular telephone disrupts

public services in violation of R.C. 2909.04(A)(3) if the conduct

substantially impairs the ability of law-enforcement officers, firefighters,

rescue personnel, emergency-medical-services personnel, or emergency-

facility personnel to respond to an emergency or to protect and preserve any

person or property from serious physical harm.

{¶ 117} In *State v. Hill*, 7th Dist. Monroe No. 09 MO 3, 2010-Ohio-4871, ¶ 28, the court noted the victim had not yet initiated contact with police, "but was about to or was in the process of calling" when the offender took the victim's phone and threw it. The court found the facts could support a conviction for disruption of public services in

45.

violation of R.C. 2909.04(A)(3), as "[t]he facts here are an example of 'substantial interference' that is even more straightforward than that of *Robinson*." *Id.*

{¶ 118} In *State v. Jackson*, 2019-Ohio-170, 131 N.E.3d 378 (3d Dist.), ¶ 67-68, the court found the state presented sufficient evidence to establish the "substantial impairment" element of R.C. 2909.04(A)(3), when the offender took the victim's cell phone and damaged it.

{¶ 119} Here, viewing the evidence in the light most favorable to the state, we find there was sufficient evidence in the record to support each element of disrupting public services, in that appellant purposely or knowingly damaged and destroyed M.B.'s phone when he slammed her phone onto the parking lot, shattering it, which substantially impaired the ability of law enforcement and emergency personnel to respond to an emergency or to protect and preserve M.B. or her property from serious physical harm. The record shows M.B. had to run, with no shoes, to her former teammate's house to seek help, since appellant had taken M.B.'s cell phone and destroyed it.

{¶ 120} Regarding the manifest weight of the evidence, considering the record, including the testimony of M.B., Detective Cox and appellant, we cannot say the jury's consideration of the testimony was unreasonable. Despite the lack of forensic testing of the cell phone, the testimony of the state's witnesses supports the conclusion that appellant knowingly or purposely damaged and ruined M.B.'s cell phone which substantially impaired the ability of law enforcement and emergency personnel to respond to an emergency or to protect and preserve M.B. or her property from serious

46.

physical harm. Therefore, we cannot find the jury clearly lost its way and created such a manifest miscarriage of justice so appellant's conviction for disrupting public services must be reversed and a new trial ordered.

{¶ 121} Accordingly, appellant's fifth and sixth assignments of error are not well-taken.

## First Assignment of Error

{¶ 122} Appellant challenges as unconstitutional the indefinite sentencing aspect of the Reagan Tokes Law ("the Law"). He notes that he raised an objection at the time of sentencing. He argues the Law violates the separation-of-powers doctrine because the determination as to whether he serves the minimum or maximum term is being made by the Ohio Department of Rehabilitation and Corrections ("ODRC"), the executive branch of the government, rather than the judicial branch. He further contends since he is not guaranteed a right to legal representation at the ODRC hearing, his due process rights are violated.

## Analysis

{¶ 123} In *State v. Stenson*, 6th Dist. Lucas No. L-20-1074, 2022-Ohio-2072, the constitutionality of the Reagan Tokes Law was challenged. We stated:

Senate Bill 201-the * * * Law-became effective on March 22, 2019. The
Law "significantly altered the sentencing structure for many of Ohio's most
serious felonies" by implementing an indefinite sentencing system for non-
life, first and second-degree felonies committed on or after its effective

47.

date. *State v. Polley*, 6th Dist. Ottawa No. OT-19-039, 2020-Ohio-3213, 2020 WL 3032862, ¶ 5, fn. 1. The Law specifies that the indefinite prison terms will consist of a minimum term, selected by the sentencing judge from a range of terms set forth in R.C. 2929.14(A), and a maximum term determined by formulas set forth in R.C. 2929.144. The Law establishes a presumptive release date from prison at the end of the minimum term, but the Ohio Department of Rehabilitation and Correction ("ODRC") may rebut the presumption if it determines, after a hearing, that one or more factors apply, including that the offender's conduct while incarcerated demonstrates that he continues to pose a threat to society. R.C. 2967.271(B), (C)(1), (2) and (3). If ODRC rebuts the presumption, it may maintain the offender's incarceration for a reasonable, additional period of time, determined by ODRC, but not to exceed the offender's maximum prison term. R.C. 2967.271(D). *Id.* at ¶ 5.

{¶ 124} We found the Law does not violate the separation-of-powers doctrine and does not, on its face, deprive offenders of their right to due process. *Id.* at ¶ 35. *See also State v. Maddox*, 6th Dist. Lucas No. L-19-1253, 2022-Ohio-1350, ¶ 7, 11, and *State v. Alexander*, 6th Dist. Lucas No. L-21-1129, 2022-Ohio-2430, ¶ 60-79.

{¶ 125} Further, in *State v. Eaton*, 6th Dist. Lucas No. L-21-1121, 2022-Ohio-2432, ¶ 143, we again found the Law, on its face, does not violate the separation-of-powers doctrine or infringe upon an offender's due process rights. With respect to the

48.

analysis of due process rights, the concurring opinion clarified that "the review hearing under the * * * Law is not focused on whether the defendant's conduct 'justifies his release from confinement'- it is focused on whether the defendant's conduct justifies not releasing him from confinement." *Id.* at ¶ 147. The concurrence observed the "distinction is crucial because the presumption that the offender will be released on a date certain, after service of the minimum term-and the burden ODRC must meet to rebut this presumption-goes to the heart of why * * * the Law is more analogous to the decision to revoke parole or probation." *Id.* Inasmuch as we concur with the due process analysis set forth in the concurring opinion of *Eaton*, we hereby adopt paragraphs 145 through 169 of *Eaton* as our own.

{¶ 126} Based on our reasoning and conclusions in the foregoing cases, we find the application of the Law to appellant's felony sentence was not unconstitutional, was not in violation of the separation-of-powers doctrine and did not violate appellant's due process rights. Accordingly, appellant's first assignment of error is not well-taken.

### Conclusion

{¶ 127} Having found all of appellant's assignments of error not well-taken, the judgment of the Wood County Common Pleas Court is affirmed. Pursuant to App.R. 24, appellant is hereby ordered to pay the costs incurred on appeal.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.

Thomas J. Osowik, J.

Myron C. Duhart, P.J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.